Tylon BROOK, Plaintiff,

v.

The CITY OF MONTGOMERY,
ALABAMA, Defendant.

Civil Action No. 94–D–1004–N.

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 12, 1996.

Paul Christian Sasser, Jr., Montgomery, AL, for plaintiff.

Thomas C. Tankersley, Montgomery, AL, George B. Azar, Montgomery, AL, for defendant.

## MEMORANDUM OPINION

DE MENT, District Judge.

Plaintiff Tylon Brook brought this action against his employer, the City of Montgomery, alleging that he was denied two promotions in June and July of 1993 because of his age and that his employer further retaliated against him for objecting to the pro-

motion of another employee in June 1993, all in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621–§ 634. Brook seeks injunctive and declaratory relief, liquidated damages and attorney's fees.

On July 17, 1995, and July 18, 1995, the court presided over a bench trial in this case. The court commends the attorneys for their exceptional quality of representation at the trial of this action and during the course of these proceedings. Their arguments and briefs have greatly assisted the court. The court, as an unbiased trier of fact, faced an exceedingly difficult task in ruling on Brook's case, as the ultimate issue of age discrimination boiled down to a credibility contest between the opposing witnesses. However, after carefully scrutinizing the facts, as applied to the applicable law, the court finds for the reasons stated herein that the City of Montgomery is entitled to prevail on the merits.[1]

## JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction),[2] as Brook alleges a violation of the ADEA, 29 U.S.C. § 621–§ 634. The parties do not contest personal jurisdiction or venue. As discussed *infra*, the court further finds that Brook has satisfied all administrative preconditions to filing a federal complaint.

## FINDINGS OF FACT

Plaintiff Tylon Brook, born June 12, 1935, is a "radio engineer" with the City of Montgomery and has worked in the City's radio shop since January 5, 1970. Record ("R.") at 13, 14, 16.[3] This ADEA action arises from his employment with the City of Montgomery. The court finds the following facts to be relevant and dispositive of the claims asserted by Brook.

**1.** Also pending before the court is the City of Montgomery's Rule 52 motion for judgment on partial findings. *See* Fed.R.Civ.P. 52. Because this memorandum opinion is dispositive of the issues in favor of the City of Montgomery, the court need not rule on this motion and will deny it as moot in a separate order.

### I. The Radio Shop

This controversy centers on employees of the City of Montgomery's "radio shop"—the department responsible for administering to the communications-equipment needs of other City departments. When the events underlying this controversy began, Robert Champion ("Champion") was communications supervisor and had been since 1969. *Id.* at 16, 87. Then and now, the supervisor's administrative duties include helping all the City departments determine and satisfy their communications-equipment needs. *Id.* at 93, 123–24. For example, he discusses equipment needs with other city department officials, prepares their equipment specifications, and then purchases and receives the equipment. *Id.* at 38, 93, 123–24. Communications equipment includes, but is not limited to, biomedical defibrillator equipment, data scopes, two-way radios, mobile radios, base stations and hand-held radios. *Id.* at 113. The supervisor also oversees, through his assistant, installation and maintenance of the equipment by the radio engineers. *Id.* at 63, 94. Moreover, the supervisor estimates the radio shop's budgetary and personnel needs, manages the radio shop employees and keeps current with regulations promulgated by the Federal Communications Commission. *Id.* at 38, 123–24.

Also when the events giving rise to this controversy began, Tom Hardin ("Hardin") was the assistant communications supervisor. *Id.* at 16, 88. Hardin became the assistant in 1976, when the City, at Champion's request, created this position. *Id.* at 88. Then and now, the assistant is both an administrator and a radio engineer. *Id.* at 94. The assistant's administrative responsibilities include prioritizing orders for installation and maintenance of equipment, assigning radio engineers to the jobs, and keeping up with parts and inventory. *Id.* at 94, 123.

**2.** Under 28 U.S.C. § 1331, the United States district courts have "original jurisdiction of all civil actions arising under the ... laws ... of the United States."

**3.** All cites to the "Record" refer to the trial transcript.

The radio engineers under Champion and Hardin were, by seniority: Brook, David Register ("Register"), James Johnson ("Johnson") and Carl Howell ("Howell"). *Id.* at 15–16, 57, 117. Radio engineers install and maintain communications equipment. *Id.* at 63. Because there are several types of communications equipment, some engineers develop specialties. *Id.* at 49, 113, 128–29.

## II. Events Giving Rise to this Controversy

The events that are the subject of this controversy began when Hardin told Champion that he planned to retire soon. *Id.* at 88, 101. Champion intended to retire shortly after Hardin and testified that he always had assumed that Hardin would replace him as supervisor. *Id.* at 88, 101. Champion, thus, began considering who among the engineers to recommend for supervisor when he retired.[4] *Id.* at 88–89. Champion planned to recommend the individual who would eventually replace him as supervisor to first be the assistant pending Champion's retirement; the assistant would then move up to supervisor and would recommend his own assistant. *Id.* at 92. Champion discussed with Hardin who to promote, and Hardin said he thought Johnson was best-qualified for the supervisor's position. *Id.* at 89. Champion also asked each of the radio engineers about their interests in being either supervisor or assistant supervisor. *Id.* at 89, 118.

### A. March 1992 Meeting

In March 1992, Champion assembled all of the employees in the radio shop's back room to discuss his and Hardin's impending retirement and who would replace them. *Id.* at 15–16, 90–91, 103–04, 119. At trial, each of the witnesses—Brook, Register, Champion, Hardin and Johnson—offered a slightly different version of how this meeting proceeded, and some witnesses' testimonies about statements made at the meeting conflicted with the testimonies of others. However, all of the witnesses except Brook agreed on this point: At the meeting, Brook never expressed an interest in being supervisor when Champion retired; the only position in which Brook expressed an interest was the assistant's position. *Id.* at 60, 67, 91, 104–05, 119. Johnson, however, was interested in both positions. *Id.* at 120, 91.

### 1. Brook's Testimony

About the March 1992 meeting, Brook testified: "I told Mr. Champion at that time I would be interested in [Hardin's] job, which was the immediate opening, and that I would be interested in the supervisor job when it came open." *Id.* at 66–67. Brook also said that, with respect to the supervisor's position, "[Champion] said [to me] that he thought the City needed a younger man for the job.... [A]nd he also indicated that [Johnson] was the man for the job because he was good with computers and woodworking and that it wouldn't be right for me to be promoted because I would get extra pay in my retirement." *Id.* at 17.

### 2. Register's Testimony

Register's testimony about the March 1992 meeting is somewhat confusing and conflicting. He remembered, however, that the position in which Brook was interested was the assistant's. *Id.* at 60. When asked about other statements made in the back-room meeting, Register first testified: "[Champion] announced that he was going to retire in a few months and he was going to ... recommend [Johnson] for the [supervisor's] job." *Id.* at 58–59. When asked by Brook's counsel, "why Champion was recommending [Johnson]?," Register said: "[Champion] said [Johnson] was good with computers and he [had] worked on specifications for a new police console.... [O]ther than that he didn't really say anything else [about] why he was recommending [Johnson]." *Id.* at 59.

Moments later, however, Register stated that the meeting about which he had been testifying occurred in spring 1993, "right before [Champion] retired."[5] *Id.* at 60.

---

**4.** Section 6(b) of the City of Montgomery's personnel rules provides: "When there are five (5) or less eligible employees for a vacancy which is to be filled by promotional appointment,"— which was the situation Champion faced—"the appointing authority may ..., based on merit and fitness for the position, ... select one of the eligible employees to fill the vacancy." R. at 21.

**5.** There is no other evidence indicating that there was a meeting of all of the employees in the

Brook's counsel then took a moment to refresh Register's recollection of the date by referring to Register's deposition testimony. *Id.* at 60–61. Thereafter, Register testified: "During [the March 1992] meeting [Champion] basically said ... [Hardin] was going to retire ... and [Champion] was ... going to recommend [Johnson] to be the assistant...." *Id.* at 61 (emphasis added). When asked again, "why Johnson?," Register said: "I don't remember anything at that meeting particularly." *Id.* at 61.

Brook's counsel then read to Register from his deposition, where in response to the question—"did [Champion] say why he was recommending [Johnson] for the assistant job?"—Register in his deposition testified: "'[W]ell, he made a comment like he thought that we needed a younger man for the job.'" *Id.* at 61–62 (quoting Register's deposition). Then, the court asked whether this "younger-man" statement had been directed at Brook, and Register replied: "I don't remember him calling any names, he just basically said he thought the shop would need a younger man for the job." *Id.* at 62.

Thereafter, Register was asked whether he remembered Champion saying "that it wouldn't be fair for Mr. Brook to get the promotion because he would get extra money in his retirement?," to which Register replied: "I think he made a comment like that...." *Id.* at 64. Then the court asked whether, when Champion made that statement, he was "talking about promoting Brook to the assistant supervisor's job," and Register replied: "I don't really remember, he just made mention of something like he would use the money for retirement purposes." *Id.*

### 3. Champion's Testimony

Champion, on the other hand, denied making any statements to anybody "about needing a younger man" or "about Mr. Brook just wanting to build his retirement up." *Id.* at 92. According to Champion, at the March 1992 meeting, he simply asked Brook whether he "was interested in taking [the supervisor] position, and he said 'no'"; although, Brook did say he was interested in being assistant supervisor. *Id.* at 91. Champion then asked Johnson whether he was interested in being supervisor and "Johnson said 'yes.'" *Id.*

### 4. Hardin's Testimony

Hardin testified that Champion made no "younger man" statement in the March 1992 meeting. *Id.* at 105–06. According to Hardin, the main topic of conversation at the March 1992 meeting was the supervisor's position; he says there was little discussion of the assistant's position. *Id.* at 104. Hardin further testified that to the "best of [his] recollection," Brook said that "[a]t that time, [he] was absolutely not interested in the supervisor job but was interested in the assistant supervisor job." *Id.* at 105.

### 5. Johnson's Testimony

Finally, Johnson testified that, occasionally, he had heard both Champion and Hardin say "[t]hat they were going to retire, leav[ing] it to a younger man," but that, by that, they meant "anybody else there," because all the radio engineers were male and were younger than Champion and Hardin. *Id.* at 124, 126. However, Johnson said, Champion made no such comment at the March 1992 meeting and had never directed such a comment "to any individual." *Id.* at 124. Johnson further testified that, in the March 1992 meeting, Champion and Hardin explained their retirement plans; then they went around the room telling each employee whether they thought he was interested in the supervisor's position or assistant supervisor's position. *Id.* at 119. About Brook, Johnson said, Champion and Hardin were "under the impression [Brook] wanted the assistant supervisor's position, but not the supervisor's," and Brook "had no response." *Id.*

---

shop's back-room in spring 1993. Based on the fact that Register testified that Hardin was at this meeting and Hardin retired in July 1992, Register appears to have been testifying about the back-room meeting that all of the other witnesses in this case testified occurred in March 1992. R. at 66, 90.

## B. July 1992 Meeting

The next event of significance to this action occurred in July 1992, a few days before Hardin retired. *Id.* at 19. Champion called Hardin, Brook and Johnson into his office to discuss the assistant supervisor's position. *Id.* Testimonies about statements made in this meeting also conflict.

### 1. Brook's Testimony

According to Brook, at that meeting, Champion said:

> ... he was going to recommend James Johnson for the supervisory position. And he went across the same thing that he had at the March meeting in that James was good with woodworking and computers, and that the city needed a younger man for the job, that it wouldn't be right for me to be promoted because I would get extra pay in my retirement check.

*Id.* at 19–20. Brook also testified: "[Champion said] that if I kept my mouth shut, I might be promoted to assistant supervisor when he, indicating [Champion], left." *Id.* at 20.

Brook testified that he objected to the promotion, and then:

> [Champion] asked me if—what I thought about him going down to the Mayor's office and informing the Mayor that he had disgruntled employee out there. And I said 'I don't know, perhaps the Mayor will ask you why the employee is disgruntled.' He further stated that he still thought Mr. Johnson was the best man for the job, and I told him basically well, 'you do whatever you think is best for you, and I will do what I think is best for me.' And of course he wanted to know what that meant, and I told him 'I could either retire, I could accept Johnson's promotion, or I could see if I could get anything done about it.'

*Id.* at 20–21.

### 2. Testimony of Champion, Hardin and Johnson

The testimonies of Champion, Hardin and Johnson about Champion's statements at the July 1992 meeting directly contradict Brook's testimony. Champion testified that at that meeting: "I said I have a very short time left to go, and in that time, I want to name Mr. Johnson my assistant ... and then he could move up into my position. And then what happened after I left would be up to him." *Id.* at 92.

When the court asked Champion about whether he had ever said "anything to anybody about needing a younger man," Champion said "'no, sir,' I never even thought that, let alone said it." *Id.* at 92. Champion also denied telling Brook that if he kept his mouth shut, he might be promoted and further denied threatening Brook that he would tell the Mayor that he had a disgruntled employee. *Id.* at 99, 101. Both Hardin and Johnson also testified that Champion made no statement about a "younger man" in the July 1992 meeting and made no statement that Brook might be promoted if he kept his mouth shut. *Id.* at 105–07, 125–26.

## III. The Promotions

In June 1993, Champion retired and recommended to the City of Montgomery that Johnson be promoted to supervisor. *Id.* at 23, 121. Shortly thereafter, City officials approved Johnson's promotion. *Id.* at 121. Johnson's date of birth is November 28, 1954. Pretrial Order at 3 (¶ 6). Soon thereafter, Johnson recommended Howell for promotion to assistant supervisor; the promotion was effective July 30, 1993. R. at 23, 133; Stipulation at ¶¶ 1–2. On the date of his appointment, Howell was 29 years old, his date of birth being October 29, 1963. Stipulation at ¶ 3.

## IV. The Acts of Alleged Retaliation

According to Brook, in retaliation for his comments that Johnson's expected promotion to supervisor was an age-motivated decision, Brook alleges that he (1) was denied the latter promotion, as well as the promotion to assistant supervisor, Pretrial Order at 6 (¶ 20); (2) was "sent on some jobs that some of the newer men should have done," R. at 25–26, and was sometimes stopped when repairing hand-held radios, his specialty, and sent to do a repair, even though other radio engineers were not busy and could have

gone, *id.* at 44; and (3) for over a year after its installation, he was not given on-site training on the police department's new dispatch center. *Id.* at 28–29.

### V. Complaints to the Equal Employment Opportunity Commission and the Filing of a Federal Lawsuit

On August 16, 1993, Brook mailed a letter to the Equal Employment Opportunity Commission ("EEOC"), which was stamped "received" on August 19, 1993. *Id.* at 29–30 (Pl.'s Ex. 1). The alleged acts of age discrimination described therein are the denials of promotions to supervisor in June 1993 and to assistant supervisor in July 1993, as well as the purported retaliatory acts. *Id.* Thereafter, on December 23, 1993, Brook filed a formal charge with the EEOC asserting that the City of Montgomery denied him the promotion to supervisor in June 1993 because of his age. Brook, however, did not file a formal charge asserting age discrimination in the denial of the promotion to assistant supervisor in July 1993. Pretrial Order at 9 (¶¶ 20 & 22). Thereafter on May 12, 1994, Brook received notice from the EEOC of its withdrawal from this cause. Brook subsequently filed this action on August 2, 1994.

### DISCUSSION

#### I. Administrative Remedies

Before examining the merits of Brook's ADEA claim, the court will address the City of Montgomery's contention that Brook's claims seeking relief for age discrimination in the denial of two promotions in June 1993 and July 1993 are barred for failure to file a charge with the EEOC within 180 days of the alleged acts of discrimination. Under the ADEA, a potential plaintiff is precluded from filing a lawsuit in federal court unless he or she has satisfied all administrative preconditions.

■ The pertinent section of the ADEA, with which Brook must comply, provides that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the EEOC. Such a charge shall be filed—(1) within 180 days after the alleged unlawful practice occurred." 29 U.S.C. § 626(d)(1).[6]

The City of Montgomery contends that Brook's letter does not constitute a "charge" under 29 U.S.C. § 626(d)(1); hence, Brook did not satisfy § 626(d)(1)'s charge-filing requirements until he filed the formal charge of discrimination on December 23, 1993. *See* Pretrial Order at 9 (¶ 19). As a result, the City of Montgomery asserts that Brook's ADEA denial of promotion claims are barred for the following reasons: (1) Brook filed a formal charge more than 180 days after the denial of the promotion in June 1993; and (2) the formal charge did not contain any facts relating to the denial of a promotion on July 30, 1993. The court rejects both arguments.[7]

The EEOC regulations interpreting § 626(d)(1) state that "[a] charge shall be in writing and shall name the prospective respondent and shall generally allege the discriminatory act(s). Charges received in person or by telephone shall be reduced to writing." 29 C.F.R. § 1626.6. Section 1626.8(a), in turn, sets forth additional information that "should be contained in the charge," such as "a clear and concise statement of the facts" and the name and address of the charging party, as well as the employ-

---

**6.** While not applicable in this action, equitable tolling may in some instances save a plaintiff's lawsuit even though he or she failed to timely file a charge within the requisite 180 days. *McClinton v. Alabama By–Products Corp.*, 743 F.2d 1483, 1485 (11th Cir.1984) (holding that failure to timely file a charge does not "deprive[ ] a court of subject matter jurisdiction, but [is] a requirement more in the nature of a statute of limitations that is subject to equitable tolling") (citation omitted) (brackets supplied).

**7.** The record does not disclose the precise date in June 1993 when Johnson was promoted to supervisor. Hence, the court cannot ascertain whether the time span between the denial of this promotion and the December 23, 1993, formal charge exceeds the time-filing requirement. In order to fall within the 180–day time limit, the denial of the promotion must have occurred on or after June 26. Because the court finds that Brook's letter dated August 16, 1993, constitutes a "charge," discussed *infra*, the exact date in June is irrelevant for purposes of determining the timeliness of the charge.

er. *Id.* at § 1626.8(a). The regulations continue, however, by providing that: "Notwithstanding the provisions of paragraph (a) of this section, a charge is sufficient when the Commission receives from the person making the charge either a written statement or information reduced to writing by the Commission that conforms to the requirements of § 1626.6." *Id.* at § 1626.8(b)

The Eleventh Circuit has held that under the EEOC's interpreting regulations, the filing of a formal charge is not the sole method by which an aggrieved employee may satisfy the charge-filing requirements under § 626(d)(1). *Clark v. Coats & Clark, Inc.*, 865 F.2d 1237, 1240–41 (11th Cir.1989) (also holding that the EEOC's regulations are to be afforded "great deference"). That is, under the ADEA, any writing that contains the more-forgiving conditions of 29 C.F.R. § 1626.8(b) will suffice as a "charge":

> The plain language of section 1626.8(b) unmistakably establishes that a charge is sufficient without the additional information [contained in § 1626.8(a) ]. Furthermore, we find that the interpretation of section 626(d)(1) advanced by these regulations is in harmony with the congressional objectives in enacting the statute. The basic purpose of the filing requirement of section 626(d)(1) "is to provide the [then] Department [of Labor, now the EEOC] with sufficient information so that it may notify prospective defendants and to provide the * * * [EEOC] with an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation." H.R.Conf.Rep. No. 950, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Admin.News 504, 528, 534. Specifically, Congress intended "that the 'charge' requirement will be satisfied by the filing of a written statement which identifies the potential defendant and generally describes the action believed to be discriminatory."

*Id.* (first set of brackets supplied).[8] In *Clark*, the plaintiff mailed the EEOC a completed Intake Questionnaire,[9] which was received 152 days after his termination. Thereafter, the EEOC mailed the defendant a notice of charge of discrimination. The plaintiff, however, did not sign the formal charge until 202 days after his discharge, and the EEOC received the charge in the mail seven days later. Finding that the informal Intake Questionnaire met the statutory objective of enabling the EEOC to notify a prospective defendant, the Eleventh Circuit held that the plaintiff had timely filed a charge of age discrimination.

The court also finds instructive the Court of Appeals for the Seventh Circuit's decision in *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132 (7th Cir.1994). There, the Seventh Circuit also analyzed the sufficiency of

---

**8.** *See also Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534 (7th Cir.1988), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3191, 105 L.Ed.2d 699 (1989), wherein the Court of Appeals for the Seventh Circuit noted that

> [t]he purpose of the charge-filing requirement is to provide the EEOC with sufficient information to notify an employer that it has been charged with discrimination and to provide the EEOC with the opportunity to investigate the alleged unlawful practice as well as to provide the EEOC with the opportunity to eliminate any unlawful practice through informal conciliation.

*Id.* at 542 (citations omitted).

**9.** When an aggrieved employee visits an EEOC office in person, he or she generally fills out an Intake Questionnaire, a pre-printed form prepared by the EEOC. The Court of Appeals for the Seventh Circuit has explained the "practical difference" between an Intake Questionnaire and a formal charge: An Intake Questionnaire

> ... asks for the person's name and address, etc., and the name and address of the alleged discriminator, asks what action was taken against the complainer that he [or she] believes was discriminatory and with what consequence, asks what the nature of the discrimination was (race, sex, age, etc.), and asks whether the complainant consents to the disclosure of his identity to the alleged discriminator. A legend at the top of the form states that "an officer of the EEOC will talk with you after you complete this form." The officer reads the completed form to see whether it appears to allege conduct within the agency's purview and if it does asks the complainer whether he [or she] wants to file a charge. If he [or she] does want to file a charge he [or she] fills out another form and a copy is sent to the employer. The completed Intake Questionnaire is the complaint. The other form, when filled out, is the charge.

*Early v. Bankers Life and Cas. Co.*, 959 F.2d 75, 79–80 (7th Cir.1992) (brackets supplied).

an Intake Questionnaire as a charge under the ADEA and stated that

> [i]n order to constitute a charge, notice to the EEOC must be of a kind that would convince a reasonable person that the plaintiff manifested an intent to activate the Act's machinery. In assessing whether the plaintiff manifested such intent, the district court may consider, *inter alia,* whether the questionnaire is precise enough to identify the parties and generally describe the complained-of practices and whether the information in the questionnaire was subsequently used to complete the formal charge.

*Id.* at 1138 (citations omitted). *See also Greanias v. Sears, Roebuck & Co.,* 697 F.Supp. 1025, 1028 (N.D.Ill.1988) (One plaintiff's Intake Questionnaire and another's oral communications with the EEOC describing the alleged acts of discrimination constituted a charge under the ADEA).

■ The court finds that Brook's two-page, type-written letter to the EEOC fulfills the liberally-construed requirements of 29 C.F.R. § 1626.8(b). In this letter, Brook discusses in detail the two promotions that he allegedly was denied, as well as the retaliatory acts allegedly taken against him for objecting to what he believed was an age-based decision not to promote him. Brook also names the supervisors employed by the City of Montgomery who allegedly committed these acts. In addition, the handwritten numbers on the top, right-hand side of Brook's letter reveal that the EEOC assigned the letter a charge number and, thus, treated the letter as a charge. Brook also later filed a formal charge on December 23, 1993, which contained some of the same information as in his letter, which in retrospect indicates that Brook sought "to activate the Act's machinery." *Downes,* 41 F.3d at 1138. Accordingly, the court finds that Brook's letter dated August 16, 1993, qualifies as a "charge" under 29 U.S.C. § 626(d)(1) and that Brook's "charge" was timely filed within 180 days of the alleged discriminatory acts, which occurred in June and July of 1993.

The ADEA imposes a second statute of limitations on potential plaintiffs. In addition to filing a charge of discrimination

"within 180 days after the alleged unlawful practice occurred," 29 U.S.C. § 626(d)(1), a plaintiff must commence a lawsuit within ninety days of receiving notice from the EEOC of its withdrawal from a case. Here, the court finds that Brook's federal lawsuit is timely because he filed the complaint eighty-two days after receiving notice from the EEOC of its withdrawal. *See id.* at § 626(e).

## II. ADEA: Denial of Promotions (Count I)

The ADEA, the federal statute under which Brook predicates liability, provides that "[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (brackets supplied). In order to fall under the ADEA's protections, an employee must be "at least 40 years of age." *Id.* at § 631(a).

■ In an action alleging disparate treatment under the ADEA, a plaintiff may prove an intentional discriminatory motive by presenting either direct, circumstantial or statistical evidence of age discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519–20, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 771–72 (11th Cir.1982); *Corbin v. Southland Int'l Trucks,* 25 F.3d 1545, 1548 (11th Cir.1994). Brook contends that at trial he proffered both direct and circumstantial evidence establishing that the City of Montgomery discriminated against the "terms and conditions" of his employment by denying him promotions on two occasions.

■ The burden of proof in ADEA cases differs depending upon whether a plaintiff has shown direct or circumstantial proof of age discrimination. Courts characterize the former as " 'mixed-motives' " cases and the latter as " 'pre-text' " cases. *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 447 (8th Cir.1993). The determination of "[w]hether a case is a pretext case or a mixed-motives case is a question for the court once all the evidence has been resolved...." *Id.* at 448.

## A. Direct Evidence

 To trigger the mixed-motives analysis, a plaintiff first must present direct evidence of age discrimination. The Eleventh Circuit defines direct evidence as "evidence, which if believed, ... prove[s] the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir.1989) (brackets supplied). As explained in *Carter*, there are limits as to what constitutes direct evidence: "[N]ot every comment concerning a person's age presents direct evidence of discrimination." *Id.* at 582 (citation omitted). For example,

> remarks merely referring to characteristics associated with increasing age, or facially neutral comments from which a plaintiff has inferred discriminatory intent, are not directly probative of discrimination. Rather, courts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age to constitute direct evidence of discrimination.

*Id.* (internal citation omitted).

 Once determined that an employee has produced direct evidence, the burden of proof shifts to the employer to "prove that the same employment decision would have been made absent any discriminatory intent." *Id.* (footnote omitted). Brook presents two pieces of direct evidence which he claims demonstrate that age was a motivating factor in his denial of promotions: Brook testified that Champion told him on several occasions that (1) "the City needed a younger man for the job" of supervisor (R. at 17, 20), and (2) that "it wasn't right for [Brook] to be promoted because [he] would get extra money when [he] retired." *Id.*

### (1) "Younger Man" statement

Regarding remarks that a "younger man" was needed to fill the position of supervisor, Brook urges the court to adopt his version of the facts and argues that not only is his testimony credible, but also is corroborated by Register, who testified on his behalf. The City of Montgomery, of course, argues that the defense witnesses' testimonies are more believable. The City of Montgomery points to Champion's denial, which was authenticated by Hardin, about ever expressing a "younger man" statement in any form.

In the alternative, the City of Montgomery asserts that at the most, Champion merely made generalized statements that when he retired, he would "leave it to a younger man," and that such general statements do not constitute direct evidence. In support of this argument, the City of Montgomery relies on Johnson's testimony that while both Champion and Hardin had made such a statement, it was never directed to any one individual. Moreover, the City of Montgomery emphasizes that Johnson stated that Champion did not utter the "younger man" statement at either of the 1992 meetings. Finally, the City of Montgomery refutes Brook's allegation that Register provided corroborating testimony. Rather, the City argues that, only after being prompted by Brook's counsel, Register stated that while Champion may have made a comment that a younger man should be promoted, Champion did not direct the statement specifically toward Brook.

During the course of the proceedings, the court carefully observed and judged the credibility of each witness. After meticulously weighing the various conflicting testimonies and viewing the entire picture as presented at trial, the court finds that the version espoused by Register and Johnson to be more credible. The court finds that because they were the most neutral players and did not have such a great stake in the outcome of the case, they had less of a reason to embellish their testimonies. In listening to Champion and Hardin, the supervisors directly implicated in this action, as well as Brook's testimony, the court sensed a strong underlying tension between them, as well as personal hostility. The court realizes that when the feelings and pride of people are directly in issue, the natural human tendency is to remember the facts in a slightly exaggerated fashion in order to preserve one's sense of dignity. Accordingly, the court finds that more likely than not, both Champion and Hardin did make "younger man" statements but did not direct the statements specifically at Brook.

The court now must determine whether this type of statement should be classified as direct or circumstantial evidence. Brook cites *Lindsey v. American Cast Iron Pipe,* 772 F.2d 799 (11th Cir.1985). In *Lindsey,* a 51–year–old male plaintiff commenced an ADEA action, alleging that his employer's failure to promote him was an age-motivated decision. The plaintiff had been employed with the defendant since 1954 and, through the years, had "worked his way up" to "the highest programming classification attainable in the [data processing] department." *Id.* at 801 (brackets supplied).

Upon learning that the position for assistant manager soon would be vacant, the plaintiff met with the Vice President of Finance, his chief assistant and the manager of the data processing department, all of whom were in charge of filling the position. *Id.* The plaintiff, who believed he was "next in line for the position," asked about rumors he had heard that they were unsatisfied with his work and then inquired about the possibility of filling the assistant manager position when it opened. *Id.* The Vice President of Finance dispelled the rumors but then stated that "the company would be looking for a person younger than [the plaintiff] to fill it." *Id.* (brackets supplied). The chief assistant and the department manager did not dispute this statement. *Id.* Subsequently, the defendant offered the job to a thirty-four-year-old employee with a lower job classification and less experience than the plaintiff. *Id.*

The Eleventh Circuit reversed the district court's order granting the defendant's motion notwithstanding the verdict and held that the district court had erred in applying the legal standard for evaluating circumstantial evidence of discrimination: The plaintiff's testimony regarding the Vice President's statement, "if believed, constitutes sufficient direct evidence." *Id.* (citations omitted).

In another case decided by the Fifth Circuit, a supervisor's statement to the plaintiff that "[i]f I can replace an expensive American expat[riate] with a younger and cheaper Brit, I can save the company a lot of money" was held not to constitute "direct evidence." *Mooney v. Aramco Serv. Co.,* 54 F.3d 1207, 1218 n. 13 (5th Cir.1995) (brackets supplied).

The Fifth Circuit explained that in order to shift the burden to the employer under the mixed-motives analysis, the employee must show that "the employer actually relied on [the forbidden factor] in making its decision." *Id.* at 1218 (internal quotes omitted) (quoting *Langley v. Jackson State Univ.,* 14 F.3d 1070, 1075 (5th Cir.1994)).

The Fifth Circuit held that although the statement raises an *inference* "that age played a part" in the termination, it is "primarily indicative of a desire to save money by employing persons at lower pay." *Mooney,* 54 F.3d at 1218. The Fifth Circuit further stated that the trial record did not contain any evidence that the defendant " 'actually relied on' " age in deciding to terminate the plaintiff. *Id.* at 1219. *See also Williams v. General Motors Corp.,* 656 F.2d 120, 130 (5th Cir. Unit B 1981) *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982) (citing as an example of direct evidence a scrap of paper on which is written "Too old-Lay Off"); *Simmons v. McGuffey Nursing Home, Inc.,* 619 F.2d 369, 371 (5th Cir.1980) (remark that board wanted younger man did not indicate that the plaintiff was terminated because of his age).

Other courts also have distinguished between general statements about age (also called "stray remarks") and age-based remarks directed toward a specific individual. For example, in *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526 (10th Cir.1994), a manager's statements that there was a need for "young blood" and that "long-term employees have a diminishing return" were "stray remarks" and were "insufficient to create a jury issue in an ADEA case." *Id.* at 531. For example, the Tenth Circuit stated that the "diminishing return" remark "could apply equally to employees under age forty. It appears to be directed at length of tenure, not age." *Id.* (citation omitted). The Tenth Circuit further held that the plaintiff had failed to establish a "nexus" between the supervisor's remarks and the plaintiff's termination. *Id.* (citations omitted) (stating that "[c]asual comments do not necessarily create a case of age discrimination").

Here, the court finds that Champion's statement that a "younger man" was needed

for the job is a "stray remark" and is not so blatant so as to rise to the level of direct evidence. Thus, the court finds that Champion and Hardin's general age statements, which very well may have been inappropriate, are not illegal. It appears to the court, and the court so finds, that any such statements were more in the nature of an offhand remark that upon retiring, they would be replaced by one of their employees, all of whom were younger than they. The court further notes that the expression "leaving it to a younger man" has through the years become a common phrase used by persons intending to "step down" and allow another individual to fill their positions.

Additionally, the court finds that the facts of this case are distinguishable from *Lindsey, supra,* because there the corporate executive directed the statement toward the plaintiff alone. Here, however, Champion and Hardin's remarks merely raise a speculation as to possible age discrimination in denying Brook a promotion. Finally, the court finds that Brook has failed show a causal connection between the remarks and the denial of the promotion, since the statements could have been directed toward any of the employees, all of whom were younger than Champion and Hardin.

In the alternative, the court finds that even if the statements were direct evidence of discrimination, the City of Montgomery has satisfied its burden of showing that Brook would not have been promoted on either occasion, regardless of the City of Montgomery's consideration of age. That is, the court finds that the general age-based remarks are not sufficient evidence that age was a motivating factor when weighed against the superior qualifications of the two younger males who were promoted instead of Brook.[10]

### (2) Retirement statement

Likewise, Champion's statement that Brook should not be promoted because he only would be enhancing his eventual retirement potential, even if accepted at face value, is not a blatant remark of age discrimination. Rather, such a statement requires the court to *infer* discrimination in order to conclude an age discriminatory animus, even more so than the "younger man" statement. In other words, to prevail, Brook must link together this statement with a chain of circumstances that leads to the existence of discrimination. As quoted in *Barnes v. Southwest Forest Indus.,* 814 F.2d 607, 611 (11th Cir.1987), " 'Congress made plain that the age statute was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or diminished vigor and competence,' " or, as here, impending retirement. In *Barnes,* the Eleventh Circuit held that a supervisor's statement to the plaintiff that in order to transfer, "you would have to take another physical examination and at your age, I don't believe you could pass" was at the most circumstantial evidence, not direct: "At most, [the supervisor's] statement establishes his opinion of [the plaintiff's] physical condition." *Id.* at 610–11 (brackets supplied). Here also, the court finds that Champion's statement, without more, does not lead to the obvious conclusion that Brook was too old to be assistant supervisor, but rather, expresses an opinion, *albeit* a bad opinion, that, by itself, relates solely to retirement.

### B. Indirect Evidence

■ In a pretext case, a plaintiff establishes intentional discrimination under a variation of the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[11] and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, Brook first must raise an inference of discrimination by establishing a prima facie case. *Batey v. Stone,* 24 F.3d 1330, 1333 (11th Cir.1994) (citation omitted). Pri-

---

**10.** The qualifications of Brook, and the ones chosen for the two promotions—Johnson and Howell—are discussed *infra* at 27–29.

**11.** While *McDonnell Douglas* involved a race discrimination claim under Title VII, courts have held that a variant of its analysis applies to claims under the ADEA as well. *Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497, 1500 (11th Cir. 1991) (*citing Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990)); *see also Corbin v. Southland Int'l Trucks,* 25 F.3d 1545, 1549 (11th Cir.1994).

ma facie proof of age discrimination in denial of promotion cases requires Brook to show: (1) that he belongs to a protected group; (2) that he applied for and was qualified for the position for which the City of Montgomery was seeking applicants; (3) that he was denied the promotion; and (4) that another equally or less qualified individual outside the protected class received the promotion. *Id.* at 1334 n. 11 (*citing Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989)); *see Earley,* 907 F.2d at 1081.

■ The City of Montgomery concedes that Brook is a member of a protected class and that Johnson and Howell are not. In 1993, when Johnson and Howell received promotions, Brook was 57 years old, Johnson 38, and Howell 29. *R.* at 16, 23, 130; *Stipulation* at ¶ 1. The City contends, however, that Brook has not established that he "was qualified for ... promotion" to supervisor or to assistant supervisor and that "other equally or less qualified employees" were promoted instead. The court agrees.

■ The City of Montgomery presented credible evidence that to effectively perform the duties of assistant supervisor and supervisor, an individual must not only possess considerable electronics experience but also needs to have characteristics showing that he handles responsibility well, takes initiative, relates well to others and pays attention to details. *Id.* at 90, 108; *Stipulation of the Parties as to Additional Testimony of James K. Johnson* at 1–2. The court recognizes that the sought-after characteristics go beyond educational degrees and listings on a resume. Rather, the City of Montgomery also was looking for a person with personality traits that demonstrated management capabilities and the ability to work well with individuals under his management. The court stresses that it does not " 'sit as a super-personnel department' or 'determine whether the employer exercised prudent business judgment.' " *Heerdink v. Amoco Oil Co.,* 919 F.2d 1256, 1260 (7th Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (quoting *LaSalle Nat. Bank v. County of DuPage,* 856 F.2d 925 (7th Cir.1988), *cert. denied,* 489 U.S. 1081, 109

S.Ct. 1536, 103 L.Ed.2d 840 (1989)); *see also Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). "It is not appropriate for the court[ ] to fetter management's discretion by substituting [its] own judgment as to proper hiring practices." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978) (brackets supplied). Thus, the court should not, and will not, require the City of Montgomery to adopt what it perceives to be the best hiring procedures. The City of Montgomery can base its employment decisions on any considerations as long as they are not discriminatory. In other words, an employer may hire, fire or, in this case, choose not to promote an employee for good reasons, bad reasons, reasons based on erroneous facts, or for no reason at all, as long as its actions are not based on discriminatory purposes. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984).

As evidence of his qualifications for the positions of assistant supervisor and supervisor, Brook testified that he had twenty-two years of experience as a radio engineer, R. at 14, held several technical degrees, *id.,* and could use the radio shop's two computers, *id.* at 19. Brook also presented Register's testimony that Register had no problem getting along with him. *Id.* at 66. Brook, however, admitted that he has had difficulty getting along with other radio shop employees, *id.* at 38–39, and that, on at least two occasions, he has lost his temper in front of people who have come to the radio shop for repairs. *Id.* at 39–40. Brook presented no evidence that Johnson and Howell had any difficulty getting along with other people and presented no evidence contradicting the City's testimony that Brook lacked initiative.

■ The only evidence Brook presented about Johnson and Howell's qualifications was Brook's own testimony that he thought his qualifications were equal to or greater than those of Johnson and Howell. *Id.* at 15. Brook's naked assertion of equality is insufficient to sustain his burden of proof. The court finds that Brook failed to present evidence that he possessed all of the qualifica-

tions necessary to be assistant supervisor or supervisor and that he failed to establish that his qualifications were equal to or greater than the qualifications of Johnson and Howell.[12] Therefore, the court finds that Brook has not made out a prima facie case of age discrimination.

In order to make a complete record, however, the court will proceed with the analysis and assume that Brook has made out a prima facie case. Thus, the burden now shifts to the City of Montgomery to "articulate some legitimate, nondiscriminatory reason" for its decision not to promote Brook. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The City of Montgomery's burden is "exceedingly light," *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir.1983), as it "must merely proffer [non-age] based reasons, not prove them." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994) (citation omitted) (brackets supplied).

The court finds, and Brook concedes, that the City of Montgomery has rebutted the inference of age discrimination by asserting that Brook was not the most qualified applicant for the positions of either assistant supervisor or supervisor. The City presented evidence, in the form of testimony from Champion and Hardin, that Johnson was better qualified than Brook for the positions of assistant supervisor and supervisor. The City further presented evidence, in the form of a stipulation as to the testimony of Johnson, that Howell was better qualified than Brook to be assistant supervisor. This evidence is sufficient to satisfy the City's burden of production.

Once the defendant satisfies its burden of production, the *McDonnell Douglas* framework, with its presumptions and burdens, drops out of the case, and the only inquiry becomes "whether [the] plaintiff has proven 'that the employer intentionally discriminated against' him because of his [age]." *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749. To prove discrimination after the *McDonnell Douglas* framework drops out, a plaintiff can show (by either presentation of evidence or cross-examination of defendant's witnesses) that the employer's proffered reason was a pretext for discrimination, "[b]ut a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason." *Id.* at 515, 113 S.Ct. at 2752.[13] Moreover, age must be "a determinative factor in the employer's decision, though it need not have been the sole factor." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987); *see also Monroe v. United Air Lines, Inc.*, 736 F.2d 394, 402 (7th Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1356, 84 L.Ed.2d 378 (1985) (circuit approval for "a determining factor" jury instruction); *Cuddy v. Carmen*, 694 F.2d 853, 857–58 (D.C.Cir.1982), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985) (The plaintiff must "show by a preponderance of the evidence that age was 'a determining factor' in the employer's decision" or that age "made a difference.").

---

12. Regarding the position of supervisor, a question also exists as to whether Brook "applied" for the position. Brook was the only witness who stated that he expressed an interest in this position. The other witnesses testified that at the March 1992 meeting, Brook merely stated that he would like to be promoted to assistant supervisor, not supervisor, when Champion retired.

13. *St. Mary's* clarified its holding in *McDonnell Douglas* regarding the proof required to prevail in a Title VII case where a plaintiff presents circumstantial evidence of discrimination. Lower courts interpreting *McDonnell Douglas*, including the Court of Appeals for the Eleventh Circuit, had found that a plaintiff could satisfy his or her Title VII burden of proof "indirectly by showing that the employer's proffered explana-

tion [was] unworthy of belief." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir.1992) (holding that the plaintiff satisfied his burden by showing that employer's reasons were unworthy of credence); *Caban–Wheeler v. Elsea*, 904 F.2d 1549, 1554 (11th Cir.1990) (same). In other words, "the falsity of the employer's explanation [was] *alone enough* to compel judgment for the plaintiff." *St. Mary's*, 509 U.S. at 517, 113 S.Ct. at 2752 (emphasis supplied). *St. Mary's*, however, made it clear that a plaintiff must show by a preponderance of the evidence "*both* that the reason was false, *and* that discrimination was the real reason" ... and "it is not enough ... to disbelieve the employer...." *Id.* at 511, 113 S.Ct. at 2750 n. 4 (emphasis supplied).

Based upon *St. Mary's,* for Brook to succeed on his age discrimination claim, Brook must prove *both* that he was the best-qualified candidate for the positions of assistant supervisor and supervisor *and* that age discrimination was the "real reason" he was not promoted. For the reasons previously stated, which need not be repeated again here, the court finds that Brook failed to establish that he was the best-qualified candidate for either position. After hearing all the testimony and reviewing the trial transcript, the court finds that both Howell and Johnson were better suited for the positions of assistant supervisor and supervisor than Brook. The trial testimony that the court finds credible revealed that Brook lacked the expertise to determine the communications needs of all the City departments, lacked the ability to relate well to other City department heads, lacked initiative, was reluctant to undertake certain tasks assigned him, and was easily "infuriated" by some people who came to the radio shop for service. *R.* at 93, 96, 97–98, 109.

However, even assuming Brook could show that he was the best-qualified candidate for supervisor or assistant supervisor, his evidence does not establish that age discrimination was the "real reason" that he was not promoted. For example, Brook's evidence that age was a determining factor in Champion's decision not to promote him to supervisor was his testimony that Champion made discriminatory statements about needing a "younger man" for the supervisor's position, about Brook wanting to build up his retirement, about Brook's possibilities for promotion if he kept his mouth shut, and about Champion telling the Mayor he had a disgruntled employee. As previously explained, in light of the testimony of other witnesses in this case, the court finds that any such general remarks do not stand in the way of the City of Montgomery's decision to promote more qualified individuals. Brook has no other evidence indicating that the real reason Champion and Johnson did not recommend Brook for promotion was his age. Accordingly, the court finds that the City of Montgomery is entitled to judgment on the merits on Brook's age discrimination claims.

### III. ADEA Retaliation Claim

The ADEA also prohibits an employer from retaliating against an employee who has "opposed any practice made unlawful by this section." 29 U.S.C. § 623(d).[14] Because § 623(d) parallels the anti-retaliation provision contained in Title VII of the Civil Rights Act of 1964,[15] the Eleventh Circuit has held that proof of retaliation under the ADEA is controlled by the framework set forth in *McDonnell Douglas* and *Burdine,* discussed *supra,* in cases where, as here, a plaintiff presents circumstantial evidence of discrimination. *See Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir.1993).

Accordingly, Brook first must meet his burden of establishing a prima facie case of retaliation. In order to meet this burden, Brook must show by a preponderance of the evidence: "(1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action." *Id.* (citing *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993)). To establish a causal connection between the protected activity and the adverse employment action, Brook must demonstrate that the activity protected by the ADEA "was a 'but for' cause of the adverse employment decision.... If the employee does not bear that burden of persuasion, he or she may not

14. The ADEA's anti-retaliation provision pertinent to this case reads as follows:

It shall be unlawful for an employer to discriminate against any of his [or her] employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this sec-

tion, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or litigation under this chapter.

29 U.S.C. § 623(d) (brackets supplied).

15. *See* 42 U.S.C. §§ 2000e through 2000e–17, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

prevail." *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1346 (5th Cir.1985).

▉ Brook asserts that his confrontation with Champion about Champion's statements that a "younger man" was needed to fill the position of assistant supervisor is protected expression under the ADEA, because he was speaking out against what he believed were blatant age discriminatory comments. To prevail under the first element of the prima facie case, Brook initially must show that the activity he engaged is the type of "opposition" Congress envisioned when enacting § 623(d). The language of the ADEA's anti-retaliation provision indicates that "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint" with the EEOC. *Grant v. Hazelett Strip Casting Corp.*, 880 F.2d 1564, 1569 (2nd Cir. 1989) (citations omitted). Decisions from other circuits illustrate the "wide range of activity" protected. For example, the Fifth Circuit has held that under Title VII's similar provision prescribing retaliatory conduct, an employee's participation in boycotts and picketing against his employer's alleged discrimination against blacks in hiring and promotion was protected activity. *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1136 (5th Cir. Unit A 1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982). *See also Equal Employment Opportunity Commission v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012–14 (9th Cir.1983) (holding that the plaintiff's letter to a customer of his employer, wherein the plaintiff complained about the inadequacies of his employer's affirmative action program, was protected expression).

▉ Significantly, the employer's practice, which a plaintiff opposes, does not **in fact** have to be unlawful under the ADEA; rather, the employee need only have a "reasonable belief" that the employer's practices are discriminatory. *Coleman v. Wayne State Univ.*, 664 F.Supp. 1082, 1092 n. 5 (E.D.Mich. 1987). Hence, the court's previous finding that Champion's statements do not constitute

either direct or circumstantial evidence of age discrimination does not necessarily preclude a finding of retaliation in violation of the ADEA.

Based upon the foregoing case law, the court finds that voicing concerns about what Brook deemed to be an age-motivated comment by a supervisor is "opposition" as provided in § 623(d). Moreover, the court finds that because Champion's statement that a "younger man" should be promoted is a general characteristic from which an age-bias could be inferred, Brook's belief that Champion's remarks were discriminatory was reasonable. Moreover and most importantly, the City of Montgomery has not disputed that Brook engaged in protected activity and, at trial, stated its agreement that Brook's remarks fell under the protection of the anti-retaliation statute. Accordingly, the court finds that Brook has established the first element of his prima facie case.

According to Brook, the City of Montgomery retaliated against his protected expression (1) by denying him the promotions to assistant supervisor and supervisor, (2) by making him perform "dirty jobs," and (3) by not allowing him to attend technical training available to other employees. The court will address each in turn.

The court finds that Brook has shown that the denials of the promotions to assistant supervisor and supervisor are adverse employment actions. Brook presented evidence that although he expressed an interest in both promotions, he was denied the advancements.[16] *See Bickel v. Burkhart*, 632 F.2d 1251 (5th Cir.1980) (stating that under Title VII's retaliation provision, failure to promote is an adverse employment action). Of course, an adverse employment action is not, in and of itself, illegal, but may become so when accompanied by a discriminatory reason, which is where the "causal relation" requirement comes into play.

▉ Brook asserts that Champion's response to him—i.e., that if he "kept his

---

16. The court's finding that the denials of promotions were adverse employment decisions assumes that Brook's assertion that he vocalized an interest in the supervisor's position, a fact disput-

ed by every other witness, is credible. The court notes that it need not determine which witnesses were more believable in this regard, because Brook's claim fails on other grounds.

mouth shut," he may have a chance at another promotion—when combined with the denial of promotions to assistant supervisor and supervisor, demonstrates the requisite causal link between the protected activity and adverse employment action. The court does not agree. Specifically, the court finds for the reasons previously stated herein that the City of Montgomery's refusal to promote Brook to both positions at issue was due to his inferior qualifications as compared to the selected employees and not in retaliation for his vocal opposition to the impending promotion of Johnson to supervisor. Brook has not presented any other evidence connecting his protected speech to the alleged retaliatory action. Thus, the court finds that Brook has failed to establish a prima facie case showing that he was a victim of retaliation in violation of the ADEA.

The court further finds that Brook has not shown that the "dirty jobs" or denial of technical training were adverse employment actions. Brook testified that his supervisors retaliated against him by sending him on repair calls when other engineers should have gone. *R.* at 25–26, 44. Although Brook did not specify who sent him on these calls, he stated that the repairs were of the type that should have been assigned to "some of the newer engineers," *id.* at 25–26, or were assigned to him even though he was busy and other engineers were not busy and could have gone, *id.* at 44. Specifically, Brook explained: "[Jobs were held] from Monday to Wednesday, for instance, and when everybody in the shop was real busy, they would send me on it. I have seen calls held from early in the morning, and be sent during lunchtime so that my lunch hour would have to be taken later." *Id.* at 26.

When cross-examined, however, Brook explained that, "for several years," the radio shop has used a rotation system to determine which engineer is sent on repair calls. The engineers alternate and are "on call" twenty-four-hours-a-day for seven days at a time. *Id.* at 44–45, 129. This system naturally may result in an engineer doing a repair that a newer employee could have done or may result in an engineer who is busy being sent on a repair, even though other engineers are

not busy. *Id.* at 44–45. The on-call engineer is sent on all repair calls received during his week so that he will be familiar with any related problem should they occur after hours. *Id.* at 46, 128–29. Brook has offered no evidence that the repair calls about which he testified were anything other than a product of the radio shop's rotation system. Therefore, the court finds that Brook has not established an adverse employment action.

Brook also testified that, for about a one-year period, he was refused on-site training on the police department's new dispatch center, which was installed by other radio engineers, and although ultimately he was trained, he said he needed such training earlier to be prepared to repair it, if problems arose when he was on call. *Id.* at 28–29. Yet, on cross-examination, Brook admitted that the few times during that year that he was called to repair the dispatch center equipment, he had no trouble doing so, except once, and Howell assisted him then. *Id.* at 47. Further, Brook admitted that, even when he has been trained on a piece of communications equipment, he was sometimes unable to repair it without assistance. *Id.* at 47–48. In light of these admissions, any temporary failure to give Brook on-site training on the police department dispatcher was not an adverse action, because no such training was actually needed.

However, even assuming that a refusal to train Brook is an adverse action, the court finds that Brook failed to offer any evidence that the failure to train him was connected to his objection to Johnson's promotion. Rather, he admitted that radio engineers often develop specialties in certain areas, and Brook's specialty was the repair of hand-held radios, not assembling and repairing dispatch consoles like the police department's dispatch center. *Id.* at 48–49.

For these reasons, the court finds that Brook has failed to present a prima facie case of retaliation. Even assuming that Brook has established a prima facie case of retaliation based on the repair calls and the failure to give him on-site training, the court finds that the City of Montgomery has rebutted Brook's case with its production of evidence of legitimate business reasons for those actions. The court that the finds legiti-

mate business reason for the call-rotation system was that "if anything happened during the night [the engineer on call] would be familiar with whatever is going on." *Id.* at 130. The legitimate business reason for not giving Brook on-site training on the police department dispatcher was a perceived lack of need to do so that is supported by the fact that he has had no serious problems repairing the dispatcher. *Id.* at 48–49.

Finally, the court finds that Brook's evidence does not establish that the real reason for any of these actions he describes as adverse was retaliation. Both Champion and Johnson testified that neither they, nor anyone else at the radio shop, did anything to Brook or gave Brook any assignments as a means of retaliating against him. *Id.* at 94, 122. In light of this evidence, the court finds that judgment is due to be entered in favor of the City of Montgomery on Brook's retaliation claim.

### CONCLUSION

In sum, the court finds that Brook has not proven by a preponderance of the evidence that the City of Montgomery discriminated or retaliated against him on the basis of age in violation of the ADEA. Accordingly, the court finds that the City of Montgomery is entitled to prevail on the merits. A judgment in accordance with this memorandum opinion shall be entered separately.