**Ronald NIDA, et al., Plaintiffs,**

v.

**Charlene ECHOLS, et al., Defendants.**

**No. 1:97–CV–350A–JEC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 15, 1998.

David R. Sweat, Sweat & Giese, Athens, CA, Susan Marie Pearce Tate, Office of Susan P. Tate, Athens, GA, for Plaintiffs.

Steven Thomas Breaux, Ruth H. Fife, BellSouth Telecommunications, Inc., Atlanta, GA, for Defendants.

## *ORDER*

CARNES, District Judge.

This case is presently before the Court on defendants S. Cleve Ray, Charlene Echols and BellSouth Telecommunications, Inc.'s (hereinafter "BellSouth") Motion for Summary Judgment [12] and Motion to Strike the Expert Affidavit of Roger A. Roemmich [16]. After reviewing the record and the arguments of the parties, the Court concludes that defendants' Motion for Summary Judgment [12] should be **GRANTED IN PART AND DENIED IN PART** and Motion

to Strike the Expert Affidavit of Roger A. Roemmich [16] should be **GRANTED.**

## BACKGROUND

In August of 1995, plaintiffs in this case, Ruth Cummings, Norman Conner, John Linster and Ronald Nida, were all employees of defendant BellSouth, and were all over 40 years old. Conner had worked for BellSouth since May 12, 1969, Cummings since July 13, 1974, Linster since November 1, 1976 and Nida since August 13, 1973. (*See* Defs.' Statement of Material Facts [12] at ¶ 24.) On August 30, 1995, each plaintiff was fired for "misconduct and dishonesty including misrepresenting work schedules and falsification of records." (*Id.* at ¶ 22.)

In March and April of 1995, plaintiffs Conner, Linster and Nida worked as specialists in BellSouth's Network Management Center (hereinafter "the Center"). (*Id.* at ¶ 5.) As specialists, plaintiffs reported to Cleve Ray, the manager of the Center. (*Id.* at ¶ 2.) Ray had the responsibility of running the Center on a day-to-day basis. (*Id.*) Ray's supervisor was Charlene Echols, a director for BellSouth, who in turn reported to William Stacy, a regional general manager at the time in question. (*Id.*)

When Ray first began to manage the Center it did not operate on a 24–hour basis because BellSouth did not employ enough people to cover such a schedule. (*Id.* at ¶ 6.) When the Center was not operating on a 24–hour basis, specialists worked a four-day week, ten hours per day. (*Id.*) Over time, the Center added employees and began to operate on a twenty-four hour basis. (*Id.*)

In 1995 the Center was operating on a 24–hour basis. (*Id.*) While on such a schedule, specialists worked either of three separate eight-hour shifts, denominated as the day, evening and night shifts. (*Id.*) Ordinarily, the day shift ran from 8:00 a.m. to 4:00 p.m., the evening shift ran from 4:00 p.m. to 12:00 a.m., and the night shift ran from 12:00 a.m. to 8:00 a.m. (*Id.* at ¶ 4.) Each specialist routinely worked a five-day week, eight hours per day.[1] (*Id.* at ¶ 6.)

At the beginning of 1995, there were four specialists covering the evening shift at the Center. At some point prior to March of 1995, the evening shift lost one employee and only plaintiffs Conner, Linster and Nida were left to cover the five-day evening shift. These three individuals did not want to work a five day week. Instead, they desired to work a four-day, ten-hour shift schedule, as they had done in the past. (*See, e.g.,* Nida Dep. at 143.) Plaintiffs allege that Ray was aware that they were working this altered schedule and that he acquiesced in this arrangement around the beginning of April. (*See* Linster Dep. at 99–100; Nida Dep. at 112; Conner Dep. at 94.)

Defendants vigorously deny that Ray gave plaintiffs permission to work anything other than a five-day schedule. Rather, defendants allege that Ray denied plaintiffs' request to work a four-day schedule and that plaintiffs then conspired among themselves to work a four-day schedule and hide that fact from Ray. (*See* Defs.' Statement of Material Facts [12] at ¶ 10–11.) Indeed, defendants submit signed statements from each of the plaintiffs in which plaintiffs signed as true and correct the fact that they had changed their schedule to a four-day schedule without Ray's permission. (*Id.* at ¶ 11–12.)

In May of 1995, plaintiff Linster transferred to another work group and was replaced by plaintiff Cummings. (*See* Defs.' Statement of Material Facts [12] at ¶ 5.) When Cummings went to the evening shift, Conner and Nida explained to her that they were working a four-day week and that they had Ray's permission to work this schedule. (*See* Cummings Dep. at 29–31.)

In July of 1995, BellSouth's ombudsman line [2] received a call complaining that plaintiff Nida was not at the Center when he was scheduled to work. (*See* Defs.' Statement of Material Facts [12] at ¶ 8.) Specifically, the complainant alleged that Nida was flying his airplane when he was supposed to be at work. (*See* Fielder Dep. at 9.) Gary Fielder,

---

1. The specialists switched from a four-day, ten-hour shift schedule to a five-day, eight-hour shift schedule primarily for ease of scheduling. (*Id.* at ¶ 7.)

2. Since approximately 1994 BellSouth has maintained an 800 number, referred to as the ombudsman line, that employees may use to make complaints. (*See* Conner Dep. at 81–82.)

a manager in BellSouth's security department, responded to the ombudsman complaint and spoke with Nida on July 20, 1995. (*See* Defs.' Statement of Material Facts [12] at ¶ 8.) This conversation, along with Fielder's independent investigation, caused Fielder to come to the conclusion that the complaint concerning Nida was unsubstantiated. (*Id.*) During the course of this investigation, however, Nida made a statement that caused Fielder concern. Nida, in an apparent attempt to defend himself, told Fielder that "three co-workers had done the same thing he had done, that they were scheduled a five-day week and were working a four-day week." (Fielder Dep. at 12; *see also* Defs.' Statement of Material Facts [12] at ¶ 9.)

The sequence of events that followed this revelation and the investigation to which it led is not entirely clear. Apparently, Ray was informed of Nida's statement, passed this information on to Echols (*see* Ray Dep. at 29), and then Echols requested that Fielder investigate whether plaintiffs were working their posted schedule. (*See* Defs.' Mot. for Summ. J. [12] at Ex. 2, Ray Aff. ¶ 9.) Fielder then spoke with each of the plaintiffs on July 26, and with Ray, concerning plaintiffs' schedule. (*See* Fielder Dep. at 13, 22–24.) Ray informed Fielder that he had not given plaintiffs permission to work anything

other than a five-day week (*see* Fielder Dep. at 22), and each plaintiff signed as true and correct a statement written by Fielder which stated that the four plaintiffs had worked a four-day schedule without permission from Ray.[3] (*See* Fielder Dep. at Exs. 1, 2, 3, 4.)

Plaintiffs now claim that they had Ray's tacit permission to work a four-day week and that their schedule was not hidden from him. (*See, e.g.,* Nida Dep. at 136–37 ("We didn't hide it [their four-day schedule] from him, sir. We told him that we had our own schedule."); *see also supra,* at 1361.) Plaintiffs Linster and Nida state that they signed the statements prepared by Fielder because he told them that it would be in their best interests to do so. (*See* Linster Dep. at 91; Nida Dep. at 126.) Plaintiff Conner states that he signed the statement because he "was not worried about the document" as BellSouth had always treated its employees fairly. (*See* Conner Dep. at 105.) Plaintiff Cummings affirmed the accuracy of her statement at her deposition, but her statement expressed her belief that Nida and Conner had obtained permission from Ray to work a four-day week. (*See* Cummings Dep. at 87; *see also* n. 4.)

At the same time that Fielder was conducting his investigation, it appears that Ray also independently investigated plaintiffs.[4]

---

**3.** Plaintiff Nida's statement reads, in pertinent part:

> We (Nida, Conner, and Linster) knew our supervisor Cleve Ray would not approve of us working a 4 day week. So when we went on the 4 day week in April John Linster produced a separate schedule for the 4 day work week. Our posted schedule was a five-day work week.... We never received permission from anyone to change the schedule and no changes were made in the MTR system to reflect a 4 day schedule, 10 hour day.

(Fielder Dep. at Ex. 1.)

Plaintiff Linster's statement reads, in pertinent part:

> In March of this year Ron Nida, Norman Conner and I got together and decided that we could cover the center and work a 4 day work week.... I made the posted schedule and then prepared another one for the actual days we would work. We did not receive permission for the 4 day week, but Cleve Ray had told us to work out the schedule and just get the work done.

(Fielder Dep. at Ex. 2.)

Plaintiff Conner's statement reads, in pertinent part:

> About March of this year Linster, Nida, and I decided to work on a 4 day work week. We knew our supervisor Cleve Ray would not approve, but he had told us to just get the work done. Even though we didn't have permission, the 3 of us started working the 4 day week and worked that way until June of this year. The posted schedule was a 5 day week.

(Fielder Dep. at Ex. 3.)

Plaintiff Cummings' statement reads, in pertinent part:

> I came into the group about 5–1–95 and Ron and Norman told me they were working a 4 day work week, even though the posted schedule was for 5 days. I never asked my supervisor Cleve Ray but I also began working the 4 day week.... I realize I should have obtained permission from my supervisor to work a schedule that was different from the posted schedule, but Nida and Conner told me that Ray had told them to just work out the schedule to cover the center.

(Fielder Dep. at Ex. 4.)

**4.** During his deposition, Ray stated that he looked at log books to determine how many hours plaintiffs were working (*see* Ray Dep. at

After looking into the matter, Ray discussed the investigation with his immediate supervisor, Echols. (*See* Ray Dep. at 29–30.) Ray and Echols jointly came to the conclusion that the appropriate punishment for plaintiffs' actions should be time off without pay. (*See* Ray Dep. at 35.)

Echols then initiated discussions with Stacy, her immediate supervisor, concerning plaintiffs' punishment. (*See* Echols Dep. at 32.) Based on the information Stacy was given by Echols, together with Fielder's investigative report, including plaintiffs' signed statements, Stacy decided that the appropriate action to take was to terminate plaintiffs' employment with BellSouth. (*See* Stacy Dep. at 6.) The basis of Stacy's decision was "that the employees had deliberately altered their schedule from the original schedule posted by their supervisor and agreed to, and by doing that, had left a rather critical center only partially covered at certain points in time." (Stacy Dep. at 7.)

Though the meetings between plaintiffs and Fielder occurred on July 26, 1995, plaintiffs continued to work, without further questioning, until August 30, 1995.[5] On August 30, both Echols and Ray met individually with each plaintiff and informed them that they were being discharged for "misconduct and dishonesty including misrepresenting work schedules and falsification of records." (Defs.' Statement of Material Facts [12] at ¶ 22.) Plaintiffs were essentially told, without warning, to clean out their desks. (*See* Echols Dep. at 91.)

Based on these actions, plaintiffs filed their complaint. Plaintiffs seek to impose liability upon defendants BellSouth, Echols and Ray through five separate causes of action. They are (1) age discrimination in violation of the Age Discrimination in Employment Act (hereinafter "ADEA"), 29 U.S.C. § 621 *et seq.;* (2) discrimination in violation of the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. § 1140 *et seq.;* (3) defamation; (4) breach of an implied contract; and (5) promissory estoppel. (*See* Compl. [1] at ¶¶ 42–51.) Defendants now move for summary judgment on each of plaintiffs' claims.

### DISCUSSION

#### I. *Summary Judgment Standard*

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir. 1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[6] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting FED.R.CIV.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th

21–22). When speaking about the investigation, Ray used the conjunctive term "we", rather than referring solely to Fielder. (*Id.* at 17.)

5. Plaintiffs claim that this lapse of time was due to the possibility of a strike in August of 1995 and that if there was a strike, BellSouth would have needed plaintiffs to cover strike assignments. (*See* Pls.' Resp. to Mot. for Summ. J. [12] at 6.)

6. The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element material to that party's case so as to create a genuine issue for trial.

## II. *Plaintiffs' ADEA Claims*

### A. *Individual Defendants*

Defendants claim that individual managers, such as Echols and Ray, are not subject to suit under the ADEA. Defendants therefore argue that plaintiffs' ADEA claim against these individual defendants must be dismissed. (*See* Defs.' Mot. for Summ. J. [12] at 3, *citing Smith v. Lomax*, 45 F.3d 402, 403 n. 4 (11th Cir.1995).)

■ It is firmly established that a plaintiff may only bring an action under the ADEA against his or her employer, and not against his or her individual supervisors. *See, e.g., Fernandez v. Community Asphalt, Inc.*, 934 F.Supp. 418, 420 (S.D.Fla.1996), *citing Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991) and *Smith v. Lomax*, 45 F.3d 402, 403 n. 4 (11th Cir.1995) ("It is axiomatic in this Circuit that suits against individuals are not allowed under either Title VII or the ADEA."). Plaintiffs did not argue to the contrary, nor could they. Thus, plaintiffs' claim under the ADEA against Echols and Ray is hereby dismissed. Plaintiffs' ADEA claim thus remains only as to defendant BellSouth.[7]

### B. *Administrative Prerequisites*

Defendants contend that plaintiff did not file a timely charge of discrimination with the EEOC, within 180 days after the alleged unlawful act, as is required by statute. The allegedly discriminatory act in this case took place on August 30, 1995. Plaintiff Nida filled out his initial intake questionnaire on October 13, 1995. (*See* Pl.'s Resp. to Mot. for Summ.J. [14] at Ex. 9.) Plaintiff Nida checked the box on this questionnaire indicating that he believed he had been discriminated against on the basis of his age, stated that he was terminated, and identified defendant as BellSouth. (*Id.*)

■ Before a plaintiff may bring suit under the ADEA, he or she must satisfy all of the administrative prerequisites set forth under the ADEA. Here, defendants argue that plaintiffs' ADEA claim must be dismissed because none of the plaintiffs filed a timely "charge" of age discrimination with the EEOC within 180 days of the alleged discriminatory act(s)[8], as is required pursuant to 29 U.S.C. § 626 (defendant).[9] As

---

7. Accordingly, in the section of this order dealing with plaintiffs' ADEA claim, the term "defendant" refers to defendant BellSouth.

8. Pursuant to 29 U.S.C. § 626(d)(1) and (2), if a state has not created legislation providing for relief from discriminatory acts of the nature in question, then the complainant must file a charge with the EEOC within 180 days. Georgia has not created such legislation. *See Delgado v. Lockheed–Georgia, Co.*, 815 F.2d 641, 646 n. 8 (11th Cir.), *reh'g denied*, 820 F.2d 1231 (11th Cir.1987).

9. 29 U.S.C. § 626(d) provides,

No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed—
(1) within 180 days after the alleged unlawful practice occurred; or
(2) in a case to which section 633(b) applies, within 300 days after the alleged unlawful practice occurred, or within 30 days after re-

plaintiff Nida clearly filed an intake questionnaire[10] in which he checked the appropriate block for age discrimination, the Court understands defendant's argument to be either that an intake questionnaire is inadequate to constitute a timely "charge," as required by statute[11] or that even if adequate, on its face, plaintiff Nida's questionnaire cannot be deemed a "charge" because the EEOC never advised defendants of its existence. Defendants do not otherwise quarrel with the adequacy of the "charge" in their motion for summary judgment on this ground. In response, plaintiffs argue that the intake questionnaire plaintiff Nida completed in his initial interview with the EEOC and an intake questionnaire plaintiff Linster allegedly completed in his initial interview with the EEOC satisfy the filing requirement imposed by 29 U.S.C. § 626 (defendant). (*See* Pls.' Resp. to Mot. for Summ.J. [14] at 9–10.) As the Court rejects defendants' contention that plaintiff Nida did not file a "charge," for the reasons discussed below, it will not consider whether plaintiff Linster's alleged filing of an intake questionnaire also satisfies § 626(d).[12]

In *Clark v. Coats & Clark, Inc.*, 865 F.2d 1237 (11th Cir.1989), the Eleventh Circuit addressed whether an intake questionnaire could satisfy the charge requirement imposed by § 626(d). The EEOC appeared as amicus on behalf of plaintiff and argued that the regulations it had issued regarding what is required to meet the charge requirement should be adopted. Specifically, the EEOC argued that 29 C.F.R. § 1626.8(b) should control and that, pursuant to this regulation, "any written statement describing the alleged discrimination and identifying the defendant is adequate to satisfy the filing requirement of section 626(d)(1)." *Clark*, 865 F.2d at 1240. The Eleventh Circuit agreed, stating,

> [W]e find that the interpretation of section 626 (defendant) (1) advanced by these regulations is in harmony with the congressional objectives in enacting the statute. The basic purpose of the filing requirement of section 626 (defendant) (1) "is to provide the [then] Department [of Labor, now the EEOC] with sufficient information so that it may notify prospective defendants and to provide the [EEOC] with an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation." H.R.Conf.Rep. No. 950, 95th Cong., 2d Sess., reprinted in [1978] U.S.Code Cong. & Admin.News 504, 528, 534. Specifically, Congress intended "that

---

ceipt by the individual of notice of termination of proceedings under State law, whichever is earlier.

29 U.S.C. § 626(d) (West Supp.1998).

**10.** When an aggrieved employee first visits an EEOC office, he or she is asked to fill out "an Intake Questionnaire, a pre-printed form prepared by the EEOC." *Brook v. City of Montgomery*, 916 F.Supp. 1193 (M.D.Ala.1996). The intake questionnaire is designed to ascertain the complainant's name and address, the alleged discriminator's name and address, the allegedly discriminatory action, the consequences of that action, the nature of the discrimination (race, sex, age, etc.), and whether the complainant is willing to have his identity disclosed to the alleged discriminator. *Id.* at 1201 n. 9, *quoting Early v. Bankers Life and Cas. Co.*, 959 F.2d 75, 79–80 (7th Cir.1992). If it appears to the attending EEOC officer that the complainant has pled conduct that comes within that agency's purview, then the complainant is given a second form which, when completed, constitutes a formal charge. This second form is then given to the employer. *Id.*

**11.** "[H]ere no plaintiff ever filed a formal charge alleging age discrimination, but more importantly, neither plaintiffs nor the EEOC ever notified BellSouth of an age charge.... Plaintiffs' request that this Court expand *Clark* to the present facts would deny employers the right to know about and attempt to resolve allegations of discrimination." (Dfts' Reply to Pltfs' Mot. for Summ.J. [15] at 2.)

**12.** The only evidence that plaintiff Linster offers in support of his claim that he filed an intake questionnaire is his assertion of that fact. The Court is familiar with no case, and plaintiff cites none, that allows a plaintiff's assertion, supported by nothing else, to satisfy the requirement that the plaintiff file a timely charge with the EEOC. Were that the law, there would likely be few dismissals on the ground of failure to file as plaintiffs would be free to succeed on this requirement merely on their own say-so. Further, although the depositions of the other three plaintiffs seem entirely credible and plausible to the Court in almost all regards, plaintiff Linster's deposition contains several assertions that are not consistent with his fellow plaintiffs and that do not appear credible or plausible. *See* n. 26, *infra*. Accordingly, even were it permitted to do so, the Court would be reluctant to conclude that plaintiff Linster had filed such a questionnaire on the latter's assertion alone.

the 'charge' requirement will be satisfied by the filing of a written statement which identifies the potential defendant and generally describes the action believed to be discriminatory." Id.

*Id.* at 1241. The Eleventh Circuit thus utilizes the liberal standard promulgated by the EEOC in 29 C.F.R. § 1626.8(b) to determine whether the requirements imposed by 29 U.S.C. § 626(d) have been met. *See, e.g., Brook v. City of Montgomery,* 916 F.Supp. 1193, 1202 (M.D.Ala.1996), *citing Clark,* 865 F.2d at 1240–41 ("under the ADEA, any writing that contains the more-forgiving conditions of 29 C.F.R. § 1626.8(b) will suffice as a 'charge'."). Accordingly, the Court concludes that plaintiff's Nida's questionnaire constitutes a "charge."

Defendants also argue that the Eleventh Circuit's holding in *Clark* is inapplicable because the plaintiff in *Clark* subsequently filed a formal, though untimely, charge.[13] Further, defendants note that in *Clark* the EEOC notified the employer of the charge made (*See* Defs.' Reply in Supp. of Mot. for Summ.J. [15] at 2–3.) Defendants' arguments do not persuade the Court that these facts are sufficient to distinguish this case from *Clark.* First, that plaintiff in *Clark* subsequently filed an untimely formal charge does not appear necessary to the Eleventh Circuit's holding, for it found that the "informal" questionnaire constituted a "charge". Second, while it is true that, in this case, the EEOC never notified defendants of the age claim,[14] as contrasted with *Clark* in which the EEOC promptly notified the employer of the complainant's allegations—a fact noted approvingly by the *Clark* panel—the Court does not conclude that the EEOC's failure to act should automatically be attributed to the plaintiff or prevent him from maintaining his suit. *See Steffen v. Meridian Life Ins. Co.,* 859 F.2d 534, 544 (7th Cir.1988), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3191, 105 L.Ed.2d 699 (1989). At any rate, as defendant was on notice of the facts underlying the sex discrimination claim, which were the same facts that underlie this age claim, defendant seemingly was put on notice of the pertinent facts.[15]

■ Accordingly, defendant has not persuaded the Court that plaintiff Nida failed to satisfy § 626(d). As long as one plaintiff has satisfied the charge requirement, plaintiffs who did not file valid charges may "piggyback" onto the timely charge so long as their claims "arise out of similar discriminatory treatment in the same time frame." *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1101–02 (11th Cir.), *cert denied, Helton v. Kmart Corp.,* —— U.S. ——, 117 S.Ct. 435, 136 L.Ed.2d 332 (1996) (citation omitted). Here, plaintiffs all make the same claim. As such, the remaining plaintiffs may "piggyback" onto the "charge" filed by plaintiff Nida. Thus, the Court **DENIES** defendants' motion for summary judgment based on plaintiffs' failure to satisfy 29 U.S.C. § 626(d).

## C. *Prima Facie Case*

In order to establish an age discrimination claim under 29 U.S.C. § 623(a)(1),[16] plaintiffs must first make out their *prima facie* case. If plaintiff succeeds, defendant has the opportunity to come forward with a legitimate, nondiscriminatory reason for the adverse employment action.[17] If the employer makes

---

**13.** A formal charge alleging sex discrimination was filed on behalf of Nida by the EEOC. The Court is uncertain why the EEOC did not also file a formal charge alleging age discrimination, as that block was also checked. The parties have not offered an explanation for that omission. Presumably, there could be circumstances in which the omission of a claim of a particular type of discrimination from a formal charge, even where included in the intake questionnaire, could preclude a plaintiff from pursuing the omitted charge. Defendant has not educated the court on the standard to be applied in such situations and the court is reluctant to speculate on its own.

**14.** The Court assumes that the EEOC notified the defendant of the sex claim.

**15.** *See* note 13. Plaintiff Nida is a male and his comparators for purposes of the age claim are female. *See* discussion *infra* at 26. Thus, the same facts appear to underlie both claims.

**16.** The relevant portion of the statute posits:
It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.
29 U.S.C. § 623(a)(1).

**17.** "This is not a shift in the burden of persuasion but simply requires the employer to present evidence to explain its actions." *Thurman v. Robertshaw Control Co.,* 869 F.Supp. 934, 939

the necessary proffer, the burden once again shifts to plaintiffs to show that the employer's stated reason for taking the disputed action is merely a pretext for discrimination. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990), *citing Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In shouldering this burden, plaintiffs can survive summary judgment only by presenting "concrete evidence in the form of specific facts" which demonstrate the pretextual nature of defendant's articulated reason. *Id.* "Mere conclusory allegations and assertions will not suffice." *Id.* (citations omitted). Most importantly, plaintiffs [at all times] bear the burden of establishing by a preponderance of evidence that "age was a determining factor in the defendant's decision to take adverse employment action against [them]." *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1519 (11th Cir.1990). *See also Earley*, 907 F.2d at 1081 (indicating same).

 Plaintiffs can establish their *prima facie* case of discrimination in any one of three ways: (1) through direct evidence of discrimination; (2) with statistical evidence of a pattern of discrimination; or (3) by satisfying the test articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Earley*, 907 F.2d at 1081. In this case, plaintiffs maintain that they can demonstrate their *prima facie* case under any of the three avenues enumerated above. (*See* Pls.' Resp. to Mot. for Summ.J. [14] at 11.)

### 1. Statistical Evidence or Direct Evidence of Discrimination

Notwithstanding their contention, plaintiffs clearly cannot make out a *prima facie* case on either the direct evidence method or the statistical method of proving discrimination. As to the latter, plaintiffs make only conclusory arguments, supported by no evidence. Instead, all the evidence supports defendant's position on this issue.

(N.D.Ga.1994) (O'Kelley, J.). "If successful, the employer defeats the presumption of intentional discrimination created by the prima facie case." *Id.*, citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

As to the direct evidence method, the Court concludes that plaintiffs have not shown direct evidence of discrimination. Although there were some remarks by Mr. Ray, plaintiffs' immediate supervisor, that the company seemed to be looking for younger people, with specific technical training ("Devry types"), these remarks did not indicate an intent to discriminate by Mr. Ray. Rather, these remarks suggested the concerns of Mr. Ray, who was around the same age as plaintiffs, that he was out of sync with some of the younger employees whom the company was hiring.[18] Not a remark suggesting any animus by Ray, these remarks served more to suggest his empathy with persons of his and plaintiffs' ages. Indeed, one of the plaintiffs noted that Ray had never indicated any age animus. (Dep. Of Connor at 31.) Of the same import was Charlene Echols' remarks that the company seemed to be hiring more younger employees from the outside than existing employees from the inside. (Dep. Of Linster at 24–25.) Evidence open to more than one interpretation does not constitute direct evidence of discrimination. *Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n. 2. Accordingly, plaintiffs have not demonstrated direct evidence of discrimination.

### 2. McDonnell–Douglas Test

**a. How does an employee make out a *prima facie* case when he has been discharged for violation of a workplace rule?**

The Eleventh Circuit has adopted a variation of the test articulated by the Supreme Court for Title VII claims in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for cases arising under the ADEA. *See Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir.1997) (citation omitted). The Eleventh Circuit stated:

> In order to make out a prima facie case for an ADEA violation, the plaintiff must show

18. For example, Ray once said that he felt stuck in his area because of his age and the fact that he perceived the company as grooming the young, "Devry types;" he noted that, at one meeting, he was the oldest person in the room. (Linster Dep. at 28–30.)

that he (1) was a member of the protected age group, (2) was subject to adverse employment action, (3) was qualified to do the job, *see Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989), *cert. dismissed,* 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 1012 (1990), and (4) was replaced by a younger individual. *See O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 310, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996). These criteria are altered slightly in both an RIF [reduction in force] case and where a position is eliminated in its entirety; in these instances, the plaintiff establishes a prima facie case by demonstrating (1) that he was in a protected age group and was adversely affected by an employment decision, (2) that he was qualified for his current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching that decision. *Mitchell,* 967 F.2d at 567–68; *Earley,* 907 F.2d at 1082; *Verbraeken,* 881 F.2d at 1045–46.

*Benson,* 113 F.3d at 1203. As this is not a reduction-in-force case, one would initially assume that plaintiffs would have to demonstrate that they were replaced by significantly younger employees [19] before they could meet the *prima facie* test.

Both parties, however, have addressed a different test, articulated in *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984) and *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989), which provides that when an employee is discharged for an alleged violation of a workplace rule, the plaintiff must show, *not* that she was replaced by a younger person, but instead that a person outside the protected group (here, a younger person) committed a "nearly identical" workplace violation, but was sanctioned less severely than the plaintiff.[20] *Nix,* 738 F.2d at 1185.

The Court agrees that the parties have applied the correct test,[21] although there is one Eleventh Circuit opinion that suggests the contrary. Specifically, in a case decided after *Jones,* the Eleventh Circuit stated that the test articulated in *Jones* is not to be utilized when the disciplinary action in question is the termination of the employment relationship. *See Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 n. 4 (11th Cir.1994), *reh'g and reh'g en banc denied,* 46 F.3d 72 (11th Cir.1995). According to that footnote, one examines whether the workplace rules have been applied disparately only when the plaintiff has not been terminated and thus cannot show that she was replaced by a person outside of the protected class. Were the court to apply this rule announced in *Cooper–Houston,* it would have to permit more briefing as it cannot determine from this record the ages of the replacement employees.

Since *Cooper–Houston,* the court has found only one Eleventh Circuit case [22] that cites *Nix* or *Jones* and that also addresses an employment case in which an employee was terminated because of a violation of a workplace rule: *Jones v. Bessemer Carraway Medical Center,* 137 F.3d 1306 (11th Cir.

**19.** In *O'Connor, supra,* the Supreme Court indicated that a plaintiff could not satisfy the *prima facie* test by demonstrating only that one was replaced by an employee who is "insignificantly younger" than the plaintiff; for example, showing that the employer replaced a 68 year old with a 65 year old would not be adequate. 116 S.Ct. at 1310.

**20.** According to *Nix,* a terminated plaintiff who shows a disparate implementation of sanctions for a nearly identical workplace violation has made his *prima facie* case even if the replacement is also a member of the protected class. 738 F.2d at 1185. The replacement of the terminated employee with an employee in the same protected group is not irrelevant, however. The court could consider the identity of this replace-ment as evidence tending to show that the termination of the plaintiff was not a pretext for discrimination. *Id.* at 1186 n. 1.

**21.** Defendants, explicitly, and plaintiffs, implicitly, apply this test. *See* Defs.' Mot. for Summ.J. [12] at 7 and Pls.' Resp. to Mot. for Summ.J. [14] at 11 (arguing in the section of their brief dealing with proof by circumstantial evidence that plaintiffs did not violate the workplace rule or that, if they did, they were punished much more severely than other employees outside of the protected class who engaged in similar misconduct).

**22.** *Mayfield v. Patterson Pump,* 101 F.3d 1371 (11th Cir.1996) cited *Nix,* but that opinion assumed a *prima facie* case and hence did not deal with the issue discussed in text.

1998), *superceded in part on den. of reh'g*, 151 F.3d 1321 (11th Cir.1998). In this case, which the Court will refer to as *Bessemer* to distinguish it from *Jones v. Gerwens*, the panel cited *Jones* and *Nix* for the proposition that when a plaintiff is discharged for violation of a workplace rule, one looks to whether other employees outside the protected class who violated similar rules were treated less harshly. Hence, the panel in *Bessemer* did not apply the rule articulated in *Cooper–Houston* nor did it cite that case.

Accordingly, as *Cooper–Houston* did not refer in note 4 to *Nix*, which directly contradicts the statement contained in that note, and as apparently the only subsequent Eleventh Circuit case on this subject appears to have ignored the *Cooper–Houston* pronouncement and instead followed *Nix* and *Gerwens*, this court will do likewise.

b. Have plaintiffs demonstrated disparate treatment of a comparator?

█ To make a *prima facie* case, plaintiffs must show that an employee outside the protected group who committed substantially similar misconduct, in violation of workplace rules, was treated more leniently than were plaintiffs. Here, plaintiffs have argued that two employees who were under the age of forty violated a similar workplace rule, but were neither terminated nor suspended. Specifically, plaintiffs have introduced evidence that Susan Kirkman and Judy McCrary, who were both under 40 years of age, were discovered on several occasions to have changed their shifts, from night shift to day shift, without reporting the change to payroll, which resulted in excess payment to one or both women.[23] The investigation resulted in a finding that these women had obtained the prior permission of their supervisor to switch their shifts and that their failure to report this change to payroll was not malicious or willful. Given the conclusion

that the breach was one of inadvertence, not intentional deceit, the only discipline imposed on Kirkman and McCrary was the requirement that they pay the excess money back and that they receive informal counseling. (Dep. of Echols at 52–53.)

Plaintiffs argue that their misconduct was highly similar to Ms. Kirkman and Ms. McCrary's and further that, as these younger women were treated more favorably than plaintiffs for similar workplace violations, plaintiffs have made a *prima facie* case. There is no dispute that Ms. Kirkman and Ms. McCrary were outside the protected class[24] and that they received more lenient treatment than plaintiffs. Defendant vigorously disagrees, however, that the comparators' work violations were sufficiently similar to these plaintiffs' violations to allow a meaningful comparison of the varying sanctions. Accordingly, the Court must resolve this issue. Further, the Court must determine which supervisory employee can be deemed a decision-maker in this case, for if a different decision-maker made the decision regarding the discipline of Kirkman and McCrary than the decision-maker who decided plaintiffs' fate, it would arguably be inapt to compare the lenient treatment by one manager with the harsher treatment by another manager for purposes of showing disparate treatment.

Addressing the second question first, it is clear that Mr. Stacy was the final decision-maker, as he was the general manager who, when confronted with the investigative report and plaintiffs' statements, determined that plaintiffs should be fired. (Dep. of Echols at 32, 35.) Yet, plaintiffs have offered no evidence that Mr. Stacy had any role in the disciplinary decisions made concerning Kirkman and McCrary. Indeed, Mr. Stacy has testified without contradiction that he was not aware of and therefore did not take any action concerning the latter's workplace infraction. (Dep. Of Stacy at 12.)[25]

**23.** It appears clear that Ms. Kirkman received excess salary of at least $900, which she had to repay. (Dep. of Kirkman at 14.) It is less clear whether Ms. McCrary received any excess money that she would have had to repay or instead whether she received less money than was owed her as a result of the shift switch. *Id.* The record is unclear on this point, consisting of little more than what various witnesses have heard, as plaintiff apparently did not subpoena the person-

nel records that would have provided this information.

**24.** Defendant has not argued that Ms. Kirkman and McCrary were "insignificantly younger" than plaintiffs. *See* note 16, *supra*.

**25.** Charlene Echols, who was Mr. Ray's supervisor, indicated that she would have reported Kirkman and McCrary's infractions to the general manager, but was unclear who that person was

The Eleventh Circuit has noted that disciplinary measures taken by different supervisors may not be comparable for purposes of Title VII analysis. *Jones,* 874 F.2d at 1534, citing *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1271 (6th Cir.1986) and *Tate v. Weyerhaeuser,* 723 F.2d 598, 605–06 (8th Cir.1983). *Accord, Elrod v. Sears, Roebuck and Company,* 939 F.2d 1466, 1470 and n. 2 (11th Cir.1991) (employer could be liable only if one of its three agents involved in plaintiff's discharge harbored a discriminatory motive). Indeed, a plaintiff may well be unable to prove that she was similarly situated with another employee when the latter was subject to the discipline of a different supervisor than was plaintiff. *Bessemer,* 137 F.3d at 1312 n. 7.

It is clear that in this case Mr. Stacy was not involved in the disciplinary process concerning Kirkman and McCrary and, accordingly, any disparate treatment of the latter cannot suggest any age bias on Mr. Stacy's part. Indeed, given the information known to him, Mr. Stacy made a decision that was well within the bounds of reasonableness. That is, upon review of an investigatory report that was corroborated by the plaintiffs' statements, Mr. Stacy concluded that plaintiffs had changed their work shift without obtaining approval of their supervisor and had been deceitful in concealing this fact from this supervisor, as they knew the latter would not approve of the change. A decision to fire such employees does not suggest age bias. Thus, if the Court were dealing only with Mr. Stacy's role in the decision to terminate plaintiffs, it would be inclined to grant summary judgment to the defendants.

The Court is not dealing only with Mr. Stacy, however. Instead, according to plaintiffs, Mr. Ray had pertinent information about the infraction that he did not disclose to Mr. Stacy, knowledge of which information might have led Stacy to a different decision. In addition, Mr. Ray made a more lenient recommendation concerning Ms. Kirkman and McCrary than he made with regard to suggested discipline for plaintiffs. (Dep. of Ray at 45–49; Dep. of Echols at 32–36, 51–54, 62, 67.)

When a decision-maker makes an independent decision to discipline an employee, the age bias of another supervisor or subordinate cannot be attributed to that decision maker. *See, e.g., Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547–48 (7th Cir.1997), citing *Long v. Eastfield College,* 88 F.3d 300, 307 (5th cir.1996) (if decision-maker based his decision on his own independent investigation, the causal link between the subordinates' allegedly retaliatory intent and the terminations would be broken). Conversely, when the decision maker acts as the "cat's paw" or conduit of a subordinate who harbors discriminatory motives, the former cannot escape responsibility for that bias merely because layers of *pro forma* review separate the decision-maker from the subordinate who possesses an illicit motive. *Id.* Thus, if a subordinate is able to manipulate or influence a decision by concealing relevant information, the existence of bias on the part of that subordinate becomes important to the analysis. *Id.*

In the present case, plaintiffs allege, through their deposition testimony, that Mr. Ray knew that they were operating under a different schedule than that posted and that while he did not give them explicit approval for this schedule, his clear awareness of that fact and some of his own comments suggested a tacit acquiescence that led plaintiffs to believe that he approved of the flexible schedule that they had set up. Mr. Stacy noted that awareness by Mr. Ray of this modified schedule would have been important to Stacy in making his decision and that the report clearly indicated that Ray was not aware. (Dep. Of Stacy at 37–38.) Clearly, Mr. Ray did not indicate during the investigative process that he may have given tacit approval to plaintiffs.

Defendant argues that plaintiffs cannot make these allegations as they previously signed a sworn statement, during the company's investigation of the matter, in which they admitted that they had not obtained Mr. Ray's permission to operate under the four day schedule. The Court sympathizes with defendant's concern. Had plaintiffs given sworn statements that clearly contradicted their later depositions and that otherwise

when the latter's infraction occurred. (Dep. Of Echols at 64–65.)

appeared reliable, the Court would, to the extent permissible under the law, be disinclined to credit these later deposition assertions. It is the purpose of summary judgment motions to identify which real disputes of material fact exist. This process is not a game in which a plaintiff is entitled to navigate around seemingly indisputable evidence by lying and contradicting previous sworn statements merely to avoid the summary judgment that would necessarily be granted were these earlier statements relied on by the reviewing court.

Under the circumstances of this case, however, the Court finds it appropriate to consider plaintiffs' deposition testimony. First, with the exception of plaintiff Linster, the deposition testimony does not strike the Court as contradictory of the sworn statements. These statements, in essence, indicated that plaintiffs knew that they had not gotten explicit approval, nor would they get such, to work a four day schedule and that plaintiffs were wrong not to obtain such approval. The deposition testimony of Connors, Cummings, and Nida, however, does

not contradict that statement;[26] plaintiffs are keenly aware at this juncture that it was a bad mistake not to get formal approval. Instead, the deposition testimony provides more explanation as to the context of plaintiffs' conduct than does the rather bareboned sworn statements, whose strikingly similar phraseology tends to confirms plaintiffs' contention that the wording of these statements was largely arrived at by Mr. Fielder, the security investigator.[27] Plaintiffs' deposition testimony to the effect that they believed that Mr. Ray tacitly approved their schedules does not contradict their sworn statements that they did not receive formal approval from Mr. Ray. Yet, as explanatory gloss to the brief sworn statements, this deposition testimony becomes highly important in this case. Accordingly, the Court concludes that the truth-finding function is best served by considering those depositions.

Taking this deposition testimony in the light most favorable to the plaintiff, the testimony indicates that plaintiff Nida told Ray that the plaintiffs had their own schedule and

26. Plaintiff Linster's s deposition testimony *does* contradict his previous sworn statement, in that, contrary to his fellow plaintiffs, he claims that he did get Ray's explicit approval. (Dep. of Linster at 90, 94, 98–100, 108). As one would expect that, in a small work unit of three to four people, Linster's cohorts would have been aware had Ray given explicit permission—indeed, Linster testified that he told them so (*id.* at 100)—it is noteworthy that none of the other three plaintiffs have recalled in their own testimony such a conversation with Linster. Thus, Linster's testimony that Ray explicitly approved the four day schedule not only contradicts his sworn statement, but it also is inconsistent with his co-plaintiffs testimony and is generally not very credible. Specifically, Linster testified that Ray gave permission to go to a four day schedule in late 1994, but Linster declined to implement this schedule until April, 1995, even though Linster also testified that he had been regularly imploring Ray to give permission for this schedule. (*Id.* at 108, 96–98); Linster also testified that he sent Ray a list showing the new schedule, but that Linster had burned his own copy in a moment of anger after his termination (*id.* at 98), even though that list could have helped him regain his job. Further, Linster stated that he had sent Ray an E-mail confirming the new schedule, but also had never printed this transmission for himself, even though he somehow claims to know that Investigator Fielder had a copy of this E-mail (*id.* at 101): an assertion apparently viewed as so

improbable by Linster's own attorney that she did not question Fielder about this in the latter's deposition.

As the Court is considering the other three plaintiffs' deposition testimony because it does not contradict significantly the sworn statements and does not otherwise appear to be "sham" evidence, Linster's argument for considering his deposition testimony is therefore weaker than theirs. Nevertheless, Ray's implicit approval of the work schedule, which the Court must accept as true for purposes of this motion, can be attributed to Linster as well. Indeed, Linster has also testified that on one occasion Ray gave implicit permission to work four day schedules, noting that this would not work for the whole plant and that Ray would not want the day people to know about it. Linster took this statement to mean that Ray approved of the schedule. (*Id.* at 96–97). (Of course, if Ray had implicitly approved the new schedule, there would have been no reason why Linster would have kept pestering him to do so, as he also testified.) For purposes of this motion, the Court has not assumed that Ray gave explicit approval, as Linster now testifies.

27. Certainly, the Court does not wish to suggest that Mr. Fielder was wrong to summarize the plaintiffs' statements in the most concise language possible nor does the Court conclude that Mr. Fielder did anything inappropriate.

that he indicated that as long as the plaintiffs could work it out, it was alright with him (Dep of Nida at 112; Dep. of Connors at 94). Indeed, on multiple occasions, when Ray had seen only one of the plaintiffs instead of the three who should have been present on the shift, Ray inquired whether the employee was working alone that evening. When the latter answered affirmatively, Ray indicated his approval—"Do what you have to do to get the job done"—and inquired no further. (Dep. Of Ray at 39–40; *See also* Dep. of Cummings at 38). Indeed, although Mr. Ray always denies that he ever explicitly approved a change to a four day schedule when asked by these plaintiffs to do so, he has candidly admitted having the above described conversation on several occasions. (Dep. Of Ray, *id*). Further, Mr. Ray's own supervisor believes that Ray could not have failed to notice if the plaintiffs were only working four day shifts. (Dep. Of Echols at 70). Indeed, there were good reasons why Mr. Ray may not have minded these plaintiffs working their own flexible schedule. That is, while such a four day schedule may not have worked on a plant-wide basis—and indeed there was perceived manipulation of the flexible scheduling by some employees— these plaintiffs were considered to be good performers by Mr. Ray and he wished that all his other units could work as smoothly as did plaintiffs' unit. (Dep of Echols at 100; Dep. of Nida at 136, 143; Dep. of Linster at 96; Dep. of Connors at 94; Dep. of Cummings at 33, 104.)

Accordingly, taking the facts in the light most favorable to plaintiff, the Court must infer that Mr. Ray tacitly, albeit not explicitly, approved the modified schedules: a fact that could have been important to Mr. Stacy in deciding to terminate plaintiffs and a fact that was not disclosed by Mr. Ray to Mr. Stacy, who did not conduct an independent investigation, but who understandably relied on the representations made in the investigatory report. Given Mr. Ray's partial responsibility for Stacy's decision to fire plaintiffs, it is appropriate to consider whether plaintiffs have demonstrated any evidence suggesting an age based animus on Ray's part. They have, as Ray was the supervisor for Kirkland and McCrary when these two employees suffered their disciplinary action and as Ray recommended leniency given the lack of maliciousness in their actions. If Ray had been aware that he had signaled plaintiffs that he had approved their four day schedule—albeit he did not utter the magic words, "I approve"—he would necessarily have known that their actions likewise lacked a malicious intent.[28] Instead of recommending leniency for them, however, he recommended a period of suspension [29] Moreover, he did not inform Stacy that the plaintiffs might have reasonably assumed that Ray had approved their informal arrangement. That being so, Ray potentially caused harsher discipline to be meted out to plaintiffs than that which was meted out to employees under the age of 40, when both groups had committed infractions with regard to their shifts arguably without an intent to deceive their supervisor. Accordingly, plaintiff has demonstrated enough evidence of differential treatment of similarly situated employees to satisfy the *prima facie* standard. As defendant has no other neutral, non-discriminatory reason other than the one discussed throughout this section, plaintiff survives defendant's motion for summary judgment on this claim.

Having so ruled, the Court feels compelled to make two disclaimers. First, nothing in this ruling should be read as suggesting that an employee who has been fired for infraction of a workplace rule may withstand summary judgment merely by alleging that she never violated the work rule in the first place. Indeed, the Eleventh Circuit has recently made clear that a plaintiff does not make out a *prima facie* case by showing that she did not violate the work rule. Instead, the plaintiff must point to another employee who disputed a violation of a similar rule, but who was treated better. *Bessemer,* 137 F.3d at 1311 n. 6.[30] This statement is consistent

---

28. Particularly is this so with regard to plaintiff Cummings who claims that she had been told by her co-workers that Ray had approved this schedule: a claim of which Ray would have become aware during the investigation.

29. Neither Echols or Ray recommended termination for plaintiffs; both recommended a short period of suspension. (Dep. of Echols at 35–36.)

30. The court noted that to the extent *Jones v. Gerwens* suggested that one could satisfy the *prima facie* case by demonstrating compliance with

with the broader principle that even if an employer's employment decision was based on inaccurate information or mistaken judgment or was just plain unfair, that employer is not liable under federal discrimination laws unless the plaintiff introduces evidence from which one could infer an intention to discriminate on the forbidden ground by the employer.

Second, having articulated the thought process by which one could discern age-based animus by Mr. Ray, the Court is aware that the latter is not a terribly plausible scenario under this evidence. That is, it is unlikely that Mr. Ray was trying to "get" the plaintiffs, for any reason, much less their age, or that an animosity toward older workers was Ray's reason for not explaining the entire situation to Mr. Stacy. The record suggests that Mr. Ray, who himself was the same age as the plaintiffs and who had indicated his own concerns about being marginalized within the company as he got older, was pleased with the performance of these employees and was saddened at Mr. Stacy's decision to fire them. (*See, e.g.,* Dep. of Cummings at 104). Assuming that plaintiffs' assertions that Ray's tacitly approved the schedule are true, a more likely explanation than age-based animus for Mr. Ray's silence is the latter's concern that if he came forward and explained that he had winked at the plaintiffs' creation of their own schedule, Mr. Ray might have found himself in some difficulty with his boss. If true, the latter rationale for Ray's conduct might not be commendable, but it would not indicate age discrimination. Nevertheless, as long as plaintiffs have met their *prima facie* case and defendant has not otherwise rebutted that case, the plaintiffs have a right to have a jury weigh the relative plausibility of each explanation of the actions taken in this case.

The Court concludes that, albeit just barely, plaintiffs have eked by in their effort to make a *prima facie* case. Defendants may make whatever argument they wish at trial concerning the arguable implausibility of

the rule in question, the words supporting such a suggestion were only *dicta*. 137 F.3d at 1311 n. 6. Indeed, the panel in *Jones,* itself, made clear that a plaintiff does not demonstrate a *prima facie* case merely by showing compliance with the rule. Rather the panel noted: "The law is

plaintiffs' necessary argument. Accordingly, the Court **DENIES** summary judgment as to plaintiffs' age claims.

## III. *ERISA*

Plaintiffs claim that defendants discriminated against them in violation of § 510 of the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.,* by "wrongfully interfering with Plaintiffs' achievement of plateaus in their health insurance benefit plans and with Plaintiffs' opportunity to retain or to obtain other fringe benefits under early retirement or severance plan packages which would otherwise have been available to Plaintiffs, and which were offered and/or promised them shortly prior to their discharge." (Compl. [1] at ¶ 45.) Defendants now move for summary judgment claiming that plaintiffs cannot make out a *prima facie* case of discrimination under ERISA.

 Section 510 of ERISA makes it "unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled." 29 U.S.C. § 1140. In order to establish a *prima facie* case for a discriminatory discharge under this statutory provision, a plaintiff must demonstrate:

(1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination.... To satisfy the last element the plaintiff does not have to prove discriminatory intent but must introduce evidence that suggests interference with ERISA rights was a motivating factor.... The plaintiff, however, cannot establish a prima facie case merely by showing that, as a result of the termination, he was deprived of the opportunity to accrue more benefits.... Moreover, measures designed to reduce costs in general that also result in an incidental reduction in benefit expenses

clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employee successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones,* 874 F.2d at 1540.

do not suggest discriminatory intent.... Instead the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular.

*Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 559 (11th Cir.1997) *reh'g and reh'g en banc denied,* 141 F.3d 1191 (11th Cir.1998), *quoting Clark v. Coats & Clark,* 990 F.2d 1217, 1223–24 (11th Cir.1993).

Defendants point out in their reply brief in support of their motion for summary judgment that plaintiffs made no attempt to establish a *prima facie* case of discrimination under § 510 of ERISA, but rather, only addressed the effect of defendants' proffered reason for plaintiffs' discharge. (*See* Defs.' Reply in Supp. of Mot. for Summ.J. [15] at 8.) Defendants are entirely correct. Plaintiffs did not address their burden of establishing a *prima facie* case.

There is no excuse for plaintiffs to have completely disregarded their need to establish a *prima facie* case under ERISA. It is plaintiffs', and not the Court's, job to set forth evidence establishing the existence of a material issue of fact as to each of their claims.[31] *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, *quoting* FED.R.CIV.P. 56(e). As plaintiffs have failed to take this necessary action with respect to their claim of discrimination under ERISA, plaintiffs' ERISA based claim is hereby dismissed.

## IV. *Defamation*

Plaintiffs' third cause of action alleges that "[b]y speaking, writing and circulating malicious, untrue and damaging comments about Plaintiffs' characters and conduct, Defendants have defamed Plaintiffs."[32] (Compl. [1] at ¶ 47.) Through discovery, it has become clear that plaintiffs claim they were defamed when defendants noted on plaintiffs' "disciplinary entry forms" or "separation forms" that they were discharged for workplace misconduct and dishonesty. (*See* Conner Dep. at 51–52; Cummings Dep. at 53–54; Linster Dep. at 67, 73, 77; Nida Dep. at 69.) Defendants now claim that they are entitled to summary judgment on this claim because plaintiffs cannot demonstrate that defendants published any allegedly libelous or slanderous statements to any third party. (*See* Defs.' Mot. for Summ.J. [12] at 15 *et seq.*) Rather, defendants assert that no one other than the plaintiffs, Echols, Ray, plaintiff Conner's wife, and plaintiffs' counsel have seen the disciplinary entry forms or separation forms accusing plaintiffs of workplace misconduct and dishonesty, and that defendants never made an allegedly slanderous comment outside of the individual termination meetings between Echols and Ray and the plaintiffs.

In Georgia, a requisite element of both libel, *see* O.C.G.A. § 51–5–1(b), and slander, *see* O.C.G.A. § 51–5–4, is that the allegedly libelous or slanderous comment be "published" to a third party.[33] *See, e.g., Luckey v. Gioia,* 230 Ga.App. 431, 433, 496 S.E.2d 539 (1998) (publication is requisite element of tort of libel); *Terrell v. Holmes,* 226 Ga.App. 341, 343, 487 S.E.2d 6 (1997) (without publication there can be no slander). Moreover, statements made by one corporate agent to another corporate agent, when the recipient of the information has a reason to receive the information, are deemed to have not been published. *See Elder v. Cardoso,* 205 Ga.App. 144, 146, 421 S.E.2d 753 (1992). The rationale behind this rule is that such a communication is the equivalent of "speaking to one's self." *Kurtz v. Williams,* 188 Ga.

---

**31.** This task is satisfied by setting forth arguments with the pertinent evidence identified for the Court, and not by submitting numerous deposition transcripts and documents to the Court and then hoping that the Court will take it upon itself to establish plaintiffs' *prima facie* case.

**32.** In their response to defendants' motion for summary judgment, plaintiffs attempt to interject new tort-based theories of recovery into their complaint. (*See, e.g.,* Pl.'s Resp. to Mot. for Summ.J .[14] at ¶ 8 and Brief in Supp. of Resp. to Mot. for Summ.J. [14] at 18.) The Court will not consider matters beyond plaintiffs' allega-

tions that defendants committed tortious acts by "speaking, writing and circulating malicious, untrue and damaging comments about Plaintiffs' characters and conduct," as such allegations were not included in plaintiffs' complaint and plaintiffs have never sought the Court's permission to amend their complaint in order to set forth additional causes of action.

**33.** Slander and libel both developed as subsets of the tort of defamation, with slander constituting oral defamation and libel constituting written defamation. *See Williamson v. Lucas,* 171 Ga. App. 695, 700, 320 S.E.2d 800 (1984).

App. 14, 15, 371 S.E.2d 878 (1988), *quoting Walter v. Davidson*, 214 Ga. 187, 190, 104 S.E.2d 113 (1958). Thus, if plaintiffs cannot support their claim that defendants published the allegedly libelous and/or slanderous comments regarding plaintiffs with the requisite evidence, defendants' motion for summary judgment on this ground will be granted.

■ In response to defendants' assertion that plaintiffs have no evidence demonstrating that any allegedly libelous or slanderous statements, plaintiffs state:

> Defendants assert that they neither discussed the reasons for Plaintiffs' discharge with anyone outside the Company, or showed anyone the disciplinary entry forms alleging misconduct and dishonesty. Plaintiffs have little direct evidence of the same, but inasmuch as none of the Plaintiffs could find employment in their field and none of them could obtain employment for periods ranging from several months to a year, despite persistent efforts, a reasonable person could infer that Defendants' libelous statements have been published by BellSouth.

(Pls.' Resp. to Mot. for Summ.J. [14] at 20.) This bare assertion is not sufficient to withstand defendants' motion. The mere fact that plaintiffs were not able to find subsequent employment for "several months to a year" is too slender a reed upon which to infer that defendants published allegedly defamatory statements concerning plaintiffs' allegedly dishonest conduct. Plaintiffs may have been unable to find employment for any number of reasons. Accordingly, plaintiffs have not demonstrated a publication of libelous or slanderous comments by this means.

Plaintiffs also assert, "Not all publication within the Company is privileged. Ms. Cummings' former co-workers in a BellSouth North Carolina office heard she had been fired for misconduct within a couple of hours of her dismissal; so did Mr. Nida's former co-workers. They were not among the employees who had a need to know." (*Id.*) Plaintiffs offer no admissible evidence to support their assertion that former co-workers of

plaintiffs in this case had heard that plaintiffs had been fired for misconduct and dishonesty. Moreover, even plaintiffs' bald assertion fails to assert that these past co-workers heard these allegedly slanderous comments from any of the defendants in this case. Thus, this assertion also does not aid plaintiffs' attempt to withstand defendants' motion for summary judgment.

Lastly, plaintiffs argue that defendants published the allegedly libelous comments by mailing a copy of the disciplinary form in question to the "Georgia Department of Labor and to Norman Conner's ex-wife's attorney in a contempt action/modification case she filed against him when he lost health insurance coverage on their daughter as a result of his dismissal." (Pls.' Resp. to Mot. for Summ.J. [14] at 21.) First, plaintiff has not directed the Court's attention to, nor is the Court aware of, any evidence demonstrating that any of the defendants mailed a copy of the discipline entry form to plaintiff Conner's ex-wife.[34] As this litigation is at the summary judgment stage, it is plaintiff's duty to provide such evidence. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, *quoting* Fed.R.Civ.P. 56(e) (nonmoving party who will bear burden of proof on issue at trial required to go beyond pleadings and present competent evidence demonstrating existence of material issue of fact). Because plaintiffs did not, this assertion does not aid their claim that defendants published allegedly libelous statements.

■ Plaintiffs' argument that defendants' submission of the disciplinary entry forms to the Georgia Department of Labor in defense of plaintiffs' claims for unemployment compensation is also meritless. Plaintiffs claim that defendants can be held liable for such a communication if it was made with malice. (*See* Pls.' Resp. to Mot. for Summ.J. [14] at 21.) A communication from an employer to Georgia's Department of Labor, however, is entitled to an *absolute* privilege and cannot give rise to an action for slander or libel pursuant to O.C.G.A. § 34–8–122(a).

---

34. Defendants assert that Conner testified that he showed his ex-wife his disciplinary entry form. (*See* Defs.' Mot. for Summ.J .[12] at 11 n. 6.) This also is incorrect, however, as Conner testified that he showed his wife his disciplinary entry form. (*See* Conner Dep. at 54.) Conner did state, however, that he did not know of anyone who had been given his disciplinary entry form. (*Id.* at 53.)

*See Davis v. Copelan*, 215 Ga.App. 754, 765, 452 S.E.2d 194 (1994) (communication of slanderous reason for discharging plaintiff from employer to Georgia Department of Labor entitled to absolute immunity). An absolute privilege for a communication is not lost even if the communication is made with malice. *See Davis v. Shavers*, 225 Ga.App. 497, 498–99, 484 S.E.2d 243 (1997), *aff'd,* 269 Ga. 75, 495 S.E.2d 23 (1998), *quoting Wilson v. Sullivan*, 81 Ga. 238, 7 S.E. 274 (1888) ("The characteristic feature of absolute, as distinguished from conditional, privilege is, that in the former the question of malice is not open; all inquiry into good faith is closed.")

Thus, plaintiffs have failed to demonstrate that defendants published an allegedly libelous or slanderous statement in a manner that may give rise to liability under Georgia law. As such, plaintiffs' claims for libel and/or slander are dismissed.

## V. Breach of an Implied Contract

Defendants move for summary judgment on plaintiffs' fourth cause of action, breach of an implied contract. Defendants argue that plaintiffs were all employees at will, and that they could therefore be fired for "a god reason, bad reason or no reason at all." (Defs.' Mot. for Summ.J. [12] at 22.) Defendants therefore assert that plaintiffs' fourth cause of action must be dismissed.

Plaintiffs, while agreeing that they were employees at will (*see* Pls.' Resp. to Mot. for Summ.J. [14] at 22), argue that defendant BellSouth breached implied contractual obligations that arose from representations plaintiffs received from BellSouth. Plaintiffs state:

> Through the Company's statements in the Human Resources Manual regarding Flextime and progressive discipline, the Company's policy statements regarding reduction in force procedures, its custom of dealing with employees, routine use of progressive discipline, specific verbal statements made to Plaintiffs by Company officials, the performance records of the Plaintiffs and the duration of their employment, Plaintiffs had a legitimate expectation of certain contractual rights, to wit: either continued employment or benefits designed to ease the transition into unemployment, absent misconduct, and in the event of alleged misconduct, a thorough investigation of the same and uniform treatment of employees.

(*Id.* at 23.) Plaintiffs' contractual claim is thus based on both oral and written representations made by BellSouth, as well as customs typically followed by BellSouth.

Under Georgia law, if an employee is an "at will" employee, then they may be discharged for any reason without acquiring a cause of action for wrongful termination. *See* O.C.G.A. 34–7–1; *see also Lane v. K-Mart Corp.*, 190 Ga.App. 113, 378 S.E.2d 136 (1989), *quoting Jacobs v. Georgia–Pacific Corp.*, 172 Ga.App. 319, 320, 323 S.E.2d 238 (1984) ("The rule in Georgia remains hard and fast that an employer is free to discharge an employee at will for any or no reason, and that the employer's motives in discharging such an employee are legally immaterial."). Pursuant to this underlying principle, if an employee is in an at will employment relationship, oral promises concerning the conditions of employment are unenforceable " 'because the underlying employment contract, being terminable at will, is unenforceable.' " *Ely v. Stratoflex, Inc.*, 132 Ga.App. 569, 572, 208 S.E.2d 583 (1974). *See Murphine v. Hospital Auth.*, 151 Ga.App. 722, 261 S.E.2d 457 (1979)." *Buice v. Gulf Oil Corp.*, 172 Ga.App. 93, 95, 322 S.E.2d 103 (1984), *quoting Walker v. General Motors Corp.*, 152 Ga.App. 526(1), 527–28, 263 S.E.2d 266 (1979). Likewise, neither employment manuals nor other written information dispensed by an employer, unless they set forth that the employment relationship is for a definite period of time, create contractual obligations the breach of which could give rise to a cause of action. *See Lane*, 190 Ga.App. at 113–14, 378 S.E.2d 136; *Garmon v. Health Group*, 183 Ga.App. 587, 589, 359 S.E.2d 450 (1987) *Swanson v. Lockheed Aircraft Corp.*, 181 Ga. App. 876, 882(2), 354 S.E.2d 204 (1987); *Burgess v. Decatur Fed. Sav. & Loan Ass'n*, 178 Ga.App. 787, 787–88, 345 S.E.2d 45 (1986). Finally, the manner in which a company typically behaves, as construed by a discharged employee, also does not create an enforceable contract right. *See Buice*, 172 Ga.App. at 95, 322 S.E.2d 103.

Thus, as plaintiffs were employees at will, they do not have a cause of action for the breach of an implied contractual term that was allegedly created by written and/or oral representations, or by defendant Bell-South's customs. Such a cause of action is simply not recognized in Georgia. Plaintiffs' fourth cause of action is meritless and is therefore dismissed.

## VI. *Promissory Estoppel*

In response to defendants motion for summary judgment as to plaintiffs' fifth cause of action, based on a theory of promissory estoppel, plaintiffs state, "Defendants are right about one thing—Plaintiffs have not been able to unearth sufficient evidence or law to overcome Defendants' Motion for Summary Judgment concerning this issue." (Pls.' Resp. to Mot. for Summ.J. [14] at 24.) Plaintiffs' promissory estoppel claim is therefore dismissed.

## VII. *Defendants' Motion to Strike the Expert Affidavit of Roger A. Roemmich*

Plaintiffs filed the affidavit of Roger A. Roemmich in support of their opposition to defendants' motion for summary judgment. In this affidavit, Roemmich offers an analysis of the amount of money plaintiffs lost under BellSouth's pension benefit plan by being terminated in August of 1995. Defendants now move to strike this affidavit on the ground that plaintiffs did not provide defendants with an expert report concerning Roemmich until they responded to defendants' motion for summary judgment. (*See* Defs.' Mot. to Strike [16] at ¶ 3.) Defendants claim that this alleged failure has prejudiced their ability to "prepare a defense in this action." (*Id.* at ¶ 4.)

Plaintiffs respond that pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), Roemmich's expert report is not due until 90 days prior to trial. Plaintiffs further argue that they identified Roemmich by name, and summarized the subject matter of his testimony and that, therefore, defendants had the opportunity to conduct a meaningful deposition of Roemmich. (*See* Pls.' Resp. to Mot. to Strike [17] at 2.)

Inasmuch as plaintiffs' ERISA based claim has been dismissed, defendants' motion to strike is moot. To the extent, however, that this expert report might have impacted on the success of defendants' motion for summary judgment on the ERISA claim—such as by showing the benefit monies saved by defendants in firing plaintiffs—defendants' argument with regard to plaintiffs' failure to submit a timely report is meritorious.

Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure provides that if a party desires to use the testimony of an expert witness, then the party must provide

a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

FED.R.CIV.P. 26(a)(2)(B). Rule 26(a)(2)(C) provides that this report is to be produced 90 days prior to the trial date, unless otherwise directed by the court.

The Local Rules for the Northern District of Georgia provide such other direction. Local Rule 26.3C provides:

Any party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness sufficiently in advance of the close of discovery so that a similar discovery deposition of the second expert might also be conducted prior to the close of discovery.

Any party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by court order based upon a showing that the failure to comply was justified.

LR 26.3C, NDGa. Pursuant to this rule, a party who wishes to use expert testimony at trial must identify his expert witness, and

make him or her available to be deposed sufficiently early in the discovery period so that the opposing party has enough time to decide if they need rebuttal expert testimony, retain an expert, compose that expert's expert opinion report, and allow the other party the opportunity to depose that expert *within the discovery period.*

Federal Rule of Civil Procedure 26(b)(4)(A) prohibits a party from deposing an expert witness for whom an expert report is required under Federal Rule of Civil Procedure 26(a)(2)(B) until the report is provided. Thus, defendants in this action did not have the opportunity to depose Roemmich during the discovery period, nor were they able to determine whether they needed to retain their own expert, as they were not provided with the required report. Accordingly, plaintiff failed to comply with Local Rule 26.3C by failing to make Roemmich available to be deposed during the discovery period, so that defendants could decide whether they wished to retain a counter-expert, could have that expert prepare his expert report, and could make that expert available for deposition within the discovery period.

Local Rule 26.3C provides that a party who fails to comply with its mandate "shall not be permitted to offer the testimony of the party's expert unless expressly authorized by court order based upon a showing that the failure to comply was justified." LR 26.3C, NDGa. Plaintiffs have offered no reason to justify their failure to provide defendants with Roemmich's expert report other than their mistaken belief that the report was not yet due. Accordingly, to the extent that the report may have been pertinent to resolution of the motion for summary judgment, the Court declines to consider it and **grants** defendants' motion to strike. To the extent, however, that such report might be useful to plaintiffs at the trial of the age claim in order to show damages suffered by plaintiffs as a result of their termination, the Court concludes that there will be adequate time for defendants to depose plaintiffs' expert and to hire their own expert in advance of trial. Accordingly, plaintiffs may use the expert at trial for the limited purpose of demonstrating damages, to the extent that the expert can do so.

*CONCLUSION*

For the foregoing reasons, the Court finds that defendants' Motion for Summary Judgment [12] should be **GRANTED IN PART AND DENIED IN PART** and Motion to Strike the Expert Affidavit of Roger A. Roemmich [16] should be **GRANTED.** As all claims against defendants Echols and Ray have been dismissed, Echols and Ray are hereby dismissed from this action.